Mr. Justice Bradley
delivered the opinion of the court.
Immediately after tbe conquest of California the Government of the United States, through its various departments, made arrangements for the transportation of the mails between that Territory and the Atlantic ports by way of Panama. By an act of Congress passed March 3, 1847, it was, among other things, enacted as follows:
“Sec. 4. And be it further enacted, That from and immediately after the passage of this act, it shall be the duty of the Secretary'of the Navy to contract, on the part of the Government of the United States, with A. G. Sloo, of Cincinnati, for the transportation of the United States mail from New York to New Orleans twice a month, and back, touching at Charleston, (if practicable,) Savannah, and Havana; and from Havana to Chagres, and back, twice a month; the said mail to be transported in at least five steamships of not less than fifteen hundred tons burden, and propelled by engines of not less than one thousand horse-power each, to be constructed under the superintendence and direction of a naval constructor in the employ of the Navy Department, and to be so constructed as to render them convertible, at the least possible expense, into war-steamers of the first class; and that the said steamships shall be commanded by officers of the United States Navy not below the grade of lieutenant, who shall be selected by the contractor, with the approval and consent of the Secretary of the Navy, and who shall be suitably accommodated without charge to the Government. Each of said steamers shall receive on board four passed midshipmen of the United States Navy, who shall serve as watch-officers, and be suitably accommodated without charge to the Government; and each of the said steamers shall also receive on board and accommodate, without charge to the Government, one agent, to be appointed by the Postmaster-General, who shall have charge of the mails to be transported in said steamers: Provided, The Secretary of the Navy may, at his discretion, permit a steamer of not less than' six hundred tons burden, and engines in proportion, to be employed in the mail-service herein provided for between Havana and Chagres: Provided further, That the compensation for said service shall not exceed the sum of two hundred and ninety thousand dollars, and that good and sufficient security be re *120 quired for the faithful fulfillment of the stipulations of the contract. ”
In pursuance of this act, on the 20th of April, 1847, a contract was made by the Navy Department with Sloo, whereby he agreed to build five naval steamships, capable of being converted to the purposes of naval warfare, of which four were to be not less than 1,500 tons burden, and one to be not less than 600. The four larger ones were to carry the mails between New York and New Orleans, touching at Charleston, Savannah, and Havana, twice a month and back; and the smaller one was to be run from Havana to Chagres and back twice a month, carrying the mails for the Pacific. The compensation was to be $290,000 per annum and the period of service was to be ten years. The contract, among other things, contained the following provision:
“ And it is further agreed, by and between the parties aforesaid, that on tender of compensation by the said Government of the United States not exceeding a d ue proportion of the pay herein stipulated, the said A. G-. Sloo, contractor, shall convey any mail or mails of the said United States which he may be required to convey on any steamship which he, the said Sloo, may own, run, or control on the routes aforesaid, beyond the number of trips herein specified. ”
At that time the mail-service between New York and New Orleans was evidently regarded as the more important; that between Havana and Chagres being provided for by a branch line served by a single small vessel twice a month. But after the discovery of gold in California, and the rush thither of emigration and trade, the aspect of things was greatly changed. The assignees of Sloo (now represented by the appellants) purchased additional ships and established a direct line between New York and Chagres, which made the passage two days sooner than was done by the mail-ships running under the contract by way of Havana, and which, therefore, could start two days later, and, on the return, arrive two days sooner. By this means the private dispatches by the direct line had an advantage over communication by the mails, and some public dissatisfaction arose in consequence. Thereupon a correspondence on the subject ensued between the contractors and the Post-Office Department. The postmaster of New York having by direction of the Postmaster-General laid before *121 George Law, president of the United States Mail-Steamship Company, (at that time beneficially interested in Sloo’s contract,) a letter complaining of the existing arrangement, Mr. Law, on the 25th June, 1851, wrote to the postmaster a letter, in which, among other things, he said:
“ The mails for California, via Chagres, and back, are dispatched by the mail-steamships of this company twice each month, on the days originally arranged with the Department. Being required to go and return by way of Havana, and to receive and discharge there the mails from and for New Orleans, Charleston, &c., the passage is usually two days longer than the direct passage to and from Chagres and this port.
“ In addition to the mail-steamers, we dispatch also, twice a month, a steamer from this port and Chagres direct. These leave here usually two days later than the mail-steamers via Havana, so as to make the arrival at Chagres at about the-same time. Of course the return steamer with the mail from Chagres is usually two days later in arriving here, coming via Havana, than the steamer starting at the same time and coming direct. The mail to and from Chagres will, therefore, be carried with greater dispatch by the direct line, while the mails for New Orleans, Charleston, &c., must necessarily be carried by the Havana route. If the Department desires the Chagres and California mails, outward or homeward, to be sent by the direct steamers, I shall be happy to direct the commanders of the ships-to receive them on board.”
This letter was communicated to thePostmaster-General, who,, in answer, declared it satisfactory, but intimated his understanding that the proposed arrangement should make “no difference-in respect to the expense of the service.” This intimation was-met by a reply from Mr. Law correcting any such understanding. After explaining what the mail-company proposed to do, namely, to run their steamers twice a'month each way directly between New York and Chagres, twice between New York, and New Orleans, touching at Havana, and twice between New Orleans and Chagres, he said:
“ In expressing in my letter of the 25th ultimo the readiness-of this company to instruct the commanders of their steamers, direct as well as by the w7ay of Havana, to convey the California mails, if desired by the Department, it was not my intention to preclude a claim for reasonable additional compensation for *122 such service. Although, we desire to meet fully the requirements of the service and the wishes of the Department, it is not expected, I presume, that the mails can be carried outward and homeward six times per month, with the necessary additional clerks or agents, for the same sum for which we contract to carry them twice monthly. Still, desirous of promoting to the utmost the interest and convenience of the public, we are entirely willing to perform the additional service, in the confident expectation that a sense of justice will induce Congress to make such further provision as may be considered a suitable compensation for it.”
After the receipt of this letter the Postmaster-General, on the 7th of August, 1851, in answer to a letter-of the postmaster of New York asking whether he should send the mails by the steamers going direct to Chagres,'wrote as follows :
“ In answer to your letter of the 7th instant, I have to say that you will make up and forward mails by Mr. Law’s direct •steamers to Chagres; with this understanding, however, that this Department does not thereby become responsible for any additional expense.”
On the 9th of August, 1851, Marshall O. .Roberts, on behalf of the contractors, informed the postmaster at New York, by letter, that the mails for Chagres, both direct and via Havana, would be carried by the United States Mail-Steamship Company upon the terms and in the manner theretofore stated to the Post-Office Department, viz, compensation for any extra or ■additional mail-service to be submitted to Congress without requiring a prior stipulation to pay from the Department. This letter being transmitted to the Postmaster-General, with a request for directions as to sending the mails by the direct steamers, he returned a dispatch giving directions to send them.
Upon the footing of this correspondence the extra service by the direct steamers was commenced bn the 13th of .August, 1851.
A temporary suspension of the trips having occurred from some cause, further correspondence on the subject took place in 1852, in which the Secretary of the Navy as well as the Postmaster-General participated. But the general result was that the matter was left substantially in the same position as before, namely, that while the Departments declined to make themselves responsible for any compensation for the extra service, the contractors were to be left free to apply to Congress *123 for such allowance as it might deem just and reasonable. The contractors never gave up a claim for an allowance, but they consented to perform the service in reliance upon the justice of Congress, and with the distinct understanding that they should not prefer any claim against the Departments. It is unnecessary to reproduce all the correspondence that ensued. Its general purport and effect is as stated. Mr. Law, in a letter to the Postmaster-General, dated loth of June, 1852, referred to his previous letter of July 21, 1851, quoting the passage relating to compensation, in which he said: “We are entirely willing to perform the additional service, in the confident expectation that a sense of justice will induce Congress to make such further q>rovision as may be considered a suitable compensation for it.” And, to avoid any misunderstanding which might arise from expressions contained in the Postmaster-General’s communication, he adds:
“While it has not been the intention of this company to hold either of the Departments liable, directly or indirectly, for any additional mail-service beyond the conditions of the contract, but to perform it subject entirely to the decision of Congress, I desire respectfully to say that I do not feel authorized to place the company in a position that would preclude it from applying for or accepting such additional allowance as in the judgment of Congress might he considered equitable.”
Upon this understanding the service in question continued to be performed until September, 1859; and no compensation therefor has ever yet been allowed by Congress, although application has persistently been made.
From the tenor of this correspondence, it is clear that the proprietors of the Sloo contract did not rely upon that clause in it (which has been referred to) providing extra compensation for conveying mails, when required by the Government, on any steamship which might be run on the routes named in the contract beyond the number of trips therein specified. Had they relied on this clause, they would not have relinquished their claim against the Department and consented to look to Congress. Indeed, the service performed by the steamers running on the direct route between New York and Ghagres or Aspin-wall was not embraced in the terms of that provision. The route was not the same, but a different one. The question, therefore, is, whether doing the service they did, upon the foot *124 ing on which they did it, and supposing it not to be embraced within the letter of the contract, the contractors are entitled in law or equity to compensation for that service ? The service performed directly under the contract, and within its terms, has all been settled for, and the accounts closed. This is specifically found by the Court of Claims. But the question of this extra service has never been settled, but is still open and undetermined. Application, as before stated, was persistently made to Congress for an equitable allowance; but, for some reason or other, the subject was always postponed or delayed, until finally, on the 14th of July, 1870, Congress passed an act entitled uAn act for the relief of the trustees of Albert G. Sloof the tenor of which is as follows:
“•Be it enacted by the Senate and House of Representatives of the. United States of America in Congress assembled, That the claim of the trustees of Albert G. Sloo, for compensation for services in carrying the United States mails by steamers direct between New York and Chagres and New Orleans and Ohagres, in addition to the regular service required under the contract made between the said Albert G. Sloo and the United States, be, and the same is hereby, referred to the Court of Claims, and the said court is hereby directed to examine the same, and determine and adjudge whether any, and if any what, amount is due said trustees for said extra service: Provided, That the amount to be awarded by said court shall be upon the basis of the value of carrying other first-class freight of like quantity with the mails actually carried between the same ports at the same time.”
In the mean time, several years prior to the passage of this act, to wit, in 1866, as soon as the disturbances incident to the civil war had .been allayed, the appellants had presented their claim before the Court of Claims. But they were met by embarrassments arising from the peculiar form which their stipulations with the Government had assumed. They had agreed to] submit to the arbitrament of Congress, and Congress had never acted in their case. Under these circumstances the act referred to was passed. The claimants thereupon filed an amended petition, setting up the act.
The counsel for the Government contend that while this act might be used to support proceedings commenced after its passage, it cannot aid proceedings already, commenced. We think *125 that under the peculiar circumstances of this case, its well-kuo wn history, and its frequent consideration by Congress itself, the act was intended to validate the application to the Court of Claims then in progress, and to refer the whole matter to that court. It enacts that the claim be, and it hereby is, referred to the Court of Claims, and that the said court is hereby directed to examine the same and determine and adjudge, &e. The words of that act are apposite to validate the proceedings already commenced, and as those proceedings had in view the very object sought by the act, it would be a strain of technicality to turn the claimants out of court, and to compel them to commence anew.
In view, then, of the circumstances and history of this case, the correspondence between the parties, and the act of Congress referred to, what are the rights of the appellants ?
If this were a controversy between private parties, we do not think that there could be a particle of doubt that the contractor would be entitled to demand compensation upon a quantum, meruit for the performance of the service in question. Circumstances arose after the performance of the contract had commenced, which neither of the parties had anticipated or dreamed of, requiring an increase in the amount of service and a change in the manner of performing it, which could not be brought under the literal provisions of the contract. But it was of the greatest consequence that the service should be performed, and the contractors, under the exigencies of the case, were willing to depart from the literal stipulations of the instrument, and do the necessary work, relying upon Congress to provide suitable compensation. As before said, if this were a controversy between individuals, there could not be the slightest hesitation on the subject. It would present a clear case of departure from the terms of a contract, by the mutual consent of the parties, and the performance of extras by.the contractor for which he would be entitled to the reasonable value of the work performed. The service was performed on one side ; it was accepted and received on the other; and while the agents of the Government declined to incur any specific responsibilities, they agreed that the question of compensation should be settled between the contractors and their principal.
This is, in short, the whole case. And while, as a general thing, it may be true that Government ought not to be bound *126 unless prescribed rules and forms are complied with, yet where a necessary public service has been performed at the request of the proper Government agents and under the expectation of compensation, and with reliance upon Cong’ress to fix the amount; and where Congress, upon application made to it, has referred the matter to the Court of Claims, we think that that court is authorized to make and adjudge such an allowance as is required ex ceguo et dono, by all the circumstances of the case.
It is true that Congress has not determined, in express terms,, that the parties are entitled to any compensation, and refer it to the, court to decide “ whether any, and if any what, amount, is due.” But we think it is plain that Congress principally intended to refer to the adjudication of the Court of Claims the amount of compensation to which the claimants were entitled, and for that purpose prescribed the principle by which it should be estimated. But even if it was intended to refer the whole subject, the right to compensation as well as the amount, in our judgment the claimants, under the circumstances of the case, were entitled to compensation.
The decree is reversed, and the record remanded with directions to proceed according to law, and award compensation to the claimants upon the principles directed by the act of 1870.