# UNITED STATES *v.* REALTY COMPANY.

# UNITED STATES *v.* GAY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
EASTERN DISTRICT OF LOUISIANA.

Nos. 870, 869.   Argued April 22, 23, 24, 1896. — Decided May 25, 1896.

The appropriations of money by the act of March 2, 1895, c. 189, 28 Stat. 910,
933, to be paid to certain manufacturers and producers of sugar who had
complied with the provisions of the act of October 1, 1890, c. 1244, 26
Stat. 567, were within the power of Congress to make, and were constitu-
tional and valid.

It is within the constitutional power of Congress to determine whether
claims upon the public treasury are founded upon moral and honorable
obligations, and upon principles of right and justice; and having decided
such questions in the affirmative, and having appropriated public money
for the payment of such claims, its decision can rarely, if ever, be the
subject of review by the Judicial branch of the Government.

THE case is stated in the opinion.

*Mr. Assistant Attorney General Whitney* and *Mr. Solicitor
General* for plaintiffs in error.   *Mr. Assistant Attorney Gen-
eral Dodge* was on their brief.

*Mr. Charles F. Manderson, Mr. Thomas J. Semmes* and
*Mr. Joseph H. Choate* for defendants in error.   *Mr. Edward
Ham* was on Mr. Manderson's brief.

*Mr. James D. Hill* filed a brief for defendants in error.

MR. JUSTICE PECKHAM delivered the opinion of the court.

These are writs of error to the Circuit Court of the United
States for the Eastern District of Louisiana.   The actions
were brought in that court under the second section of the
act approved March 3, 1887, c. 359, 24 Stat. 505, commonly
known as the Tucker act.   Both actions were brought to

obtain payment of moneys by reason of the legislation of Congress in regard to sugar bounties. The court below in each case gave judgment for the plaintiffs therein, and the Government by writ of error brings the cases here for review.

The legislation out of which the question arises is as follows: By the act approved October 1, 1890, c. 1244, known as the tariff act of 1890, 26 Stat. 567, which act is entitled "An act to reduce the revenue and equalize duties on imports, and for other purposes," Congress legislated upon the subject of the tariff, and in that act paragraphs 231, 232, 233 and 235, "Schedule E, Sugar," (on p. 583,) read as follows:

"231. That on and after July first, eighteen hundred and ninety-one, and until July first, nineteen hundred and five, there shall be paid, from any moneys in the Treasury not otherwise appropriated, under the provisions of section three thousand six hundred and eighty-nine of the Revised Statutes, to the producer of sugar, testing not less than ninety degrees by the polariscope, from beets, sorghum or sugar cane grown within the United States, or from maple sap produced within the United States, a bounty of two cents per pound; and upon such sugar testing less than ninety degrees by the polariscope, and not less than eighty degrees, a bounty of one and three fourths cents per pound, under such rules and regulations as the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, shall prescribe.

"232. The producer of said sugar to be entitled to said bounty shall have first filed prior to July first of each year with the Commissioner of Internal Revenue a notice of the place of production, with a general description of the machinery and methods to be employed by him, with an estimate of the amount of sugar proposed to be produced in the current or next ensuing year, including the number of maple trees to be tapped, and an application for a license to so produce, to be accompanied by a bond in a penalty, and with sureties to be approved by the Commissioner of Internal Revenue, conditioned that he will faithfully observe all rules and regulations that shall be prescribed for such manufacture and production of sugar.

"233. The Commissioner of Internal Revenue, upon receiv-

ing the application and bond hereinbefore provided for, shall issue to the applicant a license to produce sugar from sorghum, beets or sugar cane grown within the United States, or from maple sap produced within the United States at the place and time with the machinery and by the methods described in the application ; but said license shall not extend beyond one year from the date thereof."

" 235. And for the payment of these bounties the Secretary of the Treasury is authorized to draw warrants on the Treasurer of the United States for such sums as shall be necessary, which sums shall be certified to him by the Commissioner of Internal Revenue, by whom the bounties shall be disbursed, and no bounty shall be allowed or paid to any person licensed as aforesaid in any one year upon any quantity of sugar less than five hundred pounds."

In 1894 Congress passed another act in relation to the tariff, which act was received by the President on the 15th of August, and became a law on the 28th of August, 1894, without his approval. Such act is entitled " An act to reduce taxation, to provide revenue for the government, and for other purposes." c. 349, 28 Stat. 509. Paragraph 162, " Schedule E, Sugar," p. 521, reads as follows :

" Schedule E. — Sugar.  182.  That so much of the act entitled ' An act to reduce revenue, equalize duties, and for other purposes,' approved October first, eighteen hundred and ninety, as provides for and authorizes the issue of licenses to produce sugar, and for the payment of a bounty to the producers of sugar from beets, sorghum or sugar cane grown in the United States, or from maple sap produced within the United States be, and the same is hereby, repealed, and hereafter it shall be unlawful to issue any license to produce sugar or to pay any bounty for the production of sugar of any kind under the said act."

By another act of Congress, approved March 2, 1895, c. 189, 28 Stat. 910, 933, entitled " An act making appropriations for sundry civil expenses of the government for the fiscal year ending June 30, 1896, and for other purposes," Congress enacted as follows :

"Bounty on sugar: That there shall be paid by the Secretary of the Treasury to those producers and manufacturers of sugar in the United States from maple sap, beets, sorghum or sugar cane grown or produced within the United States who complied with the provisions of the bounty law as contained in Schedule E of the tariff act of October first, eighteen hundred and ninety, a bounty of two cents a pound on all sugars testing not less than ninety degrees by the polariscope, and one and three fourths cents per pound on all sugars testing less than ninety and not less than eighty degrees by the polariscope, manufactured and produced by them previous to the twenty-eighth day of August, eighteen hundred and ninety-four, and upon which no bounty has previously been paid; and for this purpose the sum of two hundred and thirty-eight thousand two hundred and eighty-nine dollars and eight cents is hereby appropriated, or so much thereof as may be necessary.

"That there shall be paid to those producers who complied with the provisions of the bounty law as contained in Schedule E of the tariff act of October first, eighteen hundred and ninety, by filing the notice of application for license and bond therein required, prior to July first, eighteen hundred and ninety-four, and who would have been entitled to receive a license as provided for in said act, a bounty of eight tenths of a cent per pound on the sugars actually manufactured and produced in the United States testing not less than eighty degrees by the polariscope, from beets, sorghum or sugar cane grown or produced within the United States during that part of the fiscal year ending June thirtieth, eighteen hundred and ninety-five, comprised in the period commencing August twenty-eighth, eighteen hundred and ninety-four, and ending June thirtieth, eighteen hundred and ninety-five, both days inclusive; and for this purpose the sum of five million dollars, or so much thereof as may be necessary, is hereby appropriated; provided, that no bounty shall be paid to any person engaged in refining sugars which have been imported into the United States, or produced in the United States upon which the bounty herein provided has already been paid or applied for.

"The bounty herein authorized to be paid shall be paid upon the presentation of such proofs of manufacture and production as shall be required in each case by the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, and under such rules and regulations as shall be prescribed by the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury.

"And for the payment of such bounty the Secretary of the Treasury is authorized to draw warrants on the Treasurer of the United States for such sums as shall be necessary, which sums shall be certified to him by the Commissioner of Internal Revenue, by whom the bounty shall be disbursed, and no bounty shall be allowed or paid to any person as aforesaid upon any quantity of sugar less than five hundred pounds."

Under the provisions of the appropriation made in the last above named act of Congress, the defendant in error in each of the above cases sues for the money claimed by it and him for the manufacture of sugar under the circumstances stated in the petition in each case. They are test cases. The Realty Company is one of a class coming under the terms of the appropriation to those who had manufactured a certain class of sugar previous to the 28th day of August, 1894, and upon which no bounty had previously been paid. The allegation in the petition of the company showed that it had between the first day of July, 1893, and the 30th day of June, 1894, under the provisions of the act of 1890, produced and manufactured at the places stated the amount of sugar mentioned in the petition, and that it was entitled to receive from the defendant the bounty thereon mentioned in the act, which it was alleged amounted to the sum of $5576.97. The repeal of the bounty clause in the act of 1890 by the act which took effect on the 28th of August, 1894, and which prohibited the payment of bounties thereafter, prevented the company from obtaining the money on the warrant which had been issued to it prior to that date. There were comparatively few persons coming under the class in which the company stood, and the appropriation made for the payment of that class was a little less than $250,000.

The plaintiff in the other suit, Mr. Gay, is one of a class coming under the second portion of the act of 1895, he being among those who complied with the provisions of the bounty act as contained in Schedule E of the act of October 1, 1890, by duly filing notice of application for license and bond as therein required, and who would have been entitled to receive a license as provided for in said act, and a bounty of eight tenths of a cent per pound on the sugars actually manufactured by him according to the provisions of such act during that part of the fiscal year ending June thirtieth, 1895, comprised in the period commencing August 28, 1894, and ending June 30, 1895, both dates inclusive. The amount of bounty claimed by Mr. Gay is between eight and nine thousand dollars, and the persons forming this class are quite numerous, and the appropriation for them amounted to the sum of $5,000,000, or so much thereof as might be necessary to make the payments provided for in the act.

Counsel for the government admit that the plaintiff in each case has complied with all the terms and conditions of the act in order to entitle each to recover the moneys demanded in these suits under the act of 1895, provided that act is constitutional and valid. If it be, the judgment in each case must be affirmed.

The proper disbursing officer of the Treasury refused to pay the warrants drawn upon the Treasury in these cases upon the sole ground that the act is unconstitutional. He has been fortified in his opinion and action by the views expressed in the Court of Appeals of the District of Columbia, in the case of *United States ex rel. Miles Planting & Manufacturing Co. v. Carlisle*, reported in 5 D. C. App. 138. That company, which was a Louisiana corporation engaged in the sugar business, claimed that the repealing portion of the act of August 28, 1894, was not effective so as to cut off the rights of persons who had prior to its passage procured licenses for the fiscal year beginning July 1, 1894, and had expended money thereunder. The company therefore applied to the Supreme Court of the District of Columbia for a writ of mandamus against the Secretary of the Treasury and the Commissioner

of Internal Revenue to compel action on their part under the act of 1890. The application was resisted by the government upon several grounds, among others, that the bounty legislation of 1890 was unconstitutional. The motion was denied upon all the grounds set up by the government, including that of unconstitutionality. Mr. Justice Shepard delivered the opinion of the court and Mr. Justice Morris concurred with him upon all points. Mr. Chief Justice Alvey expressed no opinion upon the constitutional question because the conclusion that Congress had power to repeal the provision giving the bounty for sugar rendered it unnecessary to pass upon the unconstitutionality of the original bounty clause.

It was by reason of this opinion upon the validity of the bounty legislation of 1890 that the Comptroller of the Treasury reëxamined the rulings which had been previously made in approving bounty claims theretofore presented; and he had concluded to and did refer another case involving this question, then before him, to the Court of Claims for its decision in accordance with the provisions of section 1063 of the Revised Statutes, but before that case reached the Court of Claims the present cases had been commenced and decided in Louisiana.

The question whether the bounty provisions of the act of 1890 were constitutional was raised in the case of *Field* v. *Clark*, 143 U. S. 649. The contention in that case was that such provisions were unconstitutional, and that therefore the whole tariff act of 1890 was void. This court declined to decide the question as to the constitutionality of those provisions because, as the court held, the rest of the act would be valid even if the bounty provision were void. The question has been again presented to us in this case, and been very ably argued by counsel both for the government and the defendants in error. The question is one of the very gravest importance. It should not be decided without very mature investigation and deliberation, and only when absolutely necessary to the determination of the rights of the parties.

In the view we take of these cases the rights of the parties

may be passed upon and the actions finally decided without our entering upon a discussion as to the validity of the bounty legislation contained in the act of 1890, and without deciding that question. For the purpose of the discussion of this case we think it unnecessary to decide whether or not such legislation is beyond the power of Congress. We are of the opinion that in either case the appropriations of money in the act of 1895 to be paid to certain manufacturers and producers of sugar who had complied with the act of 1890 were within the power of Congress to make, and were constitutional and valid.

Without referring to the first three findings of the court below in regard to the general policy of this government in relation to the tariff, and confining our attention to those facts which are matters of history and to the acts of Congress already referred to, and to the facts set forth in the petitions in the two cases and to the admissions of the parties made for the purposes of the trial of these cases, we may briefly describe the condition of affairs existing at the time of the passage of the appropriation act of 1895.

The production and manufacture of sugar in the Southern and some portions of the Western States from sugar cane and from sorghum and beets had become at the time of the passage of the act of 1890 an industry in which large numbers of the citizens of this country were engaged, and its prosecution involved the use of a very large amount of capital. The tariff theretofore had been very high upon imported sugar, and the native industry had thereby been encouraged, fostered and greatly increased. The subject of how to treat this industry was under discussion in Congress while the tariff act of 1890 was before it, and it finally decided the question by enacting the bounty clause of that act. Before that time the revenue on imported sugar had amounted to nearly $60,000,000 in one year. To put sugar on the free list would reduce the revenue that amount, but at the same time it might, as was urged in Congress, ruin the persons engaged in the industry in this country. So the tariff on sugar was reduced while at the same time a bounty was placed upon

its production here of an amount which it was thought would equal the protection the industry had theretofore enjoyed under the tariff. The act was approved by the President and no question of its validity was made by any officer of the government having any duties to perform under it. The bounty provision was by the terms of the act to remain in force for fifteen years. The citizens who were engaged in the manufacture of sugar prepared to comply with the provisions of the law under which the bounty was to be payable.

Under that act and during its existence large sums of money were paid to sugar manufacturers as a bounty, and all manufacturers continued to manufacture in reliance upon its provisions. During these years no officer of the government questioned the validity of the act, and the bounties earned under it were paid without objection or any hint that objection would thereafter be taken while the law was in force. This condition continued for about three years. In the winter, spring and summer of 1894 it is matter of history that the discussion of the tariff act, which finally became a law on the 28th of August of that year, was continually going on in Congress and through the public prints of the country. Before the passage of the act it was, of course, wholly uncertain as to what its provisions would be, including the question of the bounty for the manufacture of sugar. No man could predict it. No one could have stated whether the bounty would be taken off entirely or materially reduced, or left as it stood by the act of 1890. The whole question of tariff legislation at that time was full of uncertainty. In the meantime the season was approaching when the manufacturer of sugar must decide what to do. He was confronted with the fact that the act of 1890 was still in existence, and under its provisions he must, if he meant to avail himself of the bounties which might be payable under the act, make his application for and obtain a license prior to July 1 of that year. In his application for a license he was compelled to give a general description of the machinery and the methods to be employed by him, with an estimate of the amount of sugar proposed to be produced in the current year, and his

application would have to be accompanied by a bond, with sureties to be approved by the Commissioner of Internal Revenue, conditioned that he would faithfully observe the rules and regulations that would be prescribed for the manufacture and production of sugar. At the same time, if he made application and obtained his license and commenced the manufacture of sugar under the provisions of the act of 1890, he could not be certain that the Congress might not strike out altogether the provision for the payment of any bounty and he be left in such a condition that he could neither manufacture with profit nor abstain from manufacturing without loss. All this by no fault of his; doing his very best, exerting his every energy, sleeplessly vigilant at all points, it was yet impossible for him to decide what to do in this state of uncertainty, or to even guess which would be the road least liable to lead to great pecuniary loss, if not to ruin. Already embarked in the business and in this state of uncertainty, the manufacturer finally concludes to go on as if the act were to remain in existence, feeling probably a firm reliance that the government would not treat its citizens unjustly or unfairly by a sudden repeal of the bounty law without making some temporary provision of another nature by which justice would be done him. He applied for a license and commenced his preparations, as the then existing act of 1890 provided that he might do. Making his arrangements for the prospective year and preparing for the manufacture of sugar during that time, the manufacturer is, subsequently, confronted by the act of Congress taking effect August 28, 1894, totally repealing the provisions of the act of 1890 upon the subject of bounties and prohibiting from that time the payment thereof. This was the position of the plaintiff, Mr. Gay, and of large numbers of other people. The Realty Company occupied a still more unfortunate position. That company had manufactured sugar between the 1st of July, 1893, and the 1st of July, 1894, during the whole of which period the act of 1890 was in full force, and after July 1, 1894, the company obtained the warrants, duly certified and authenticated by the local government officers in Louisiana,

for the payment of its claim to bounty, but before actual payment from the Treasury of the United States could be obtained the act of 1894 came into existence, with its provision directing that no further payment of bounty should thereafter be made. Of course, under the circumstances, as set forth in regard to the plaintiffs in the above suits, there can be and is no question made as to the entire good faith of all parties, and the question presented to this court is one of constitutional power simply.

This condition of affairs confronted the Congress which passed the appropriation in question. It is now argued by counsel for the government that Congress had no valid power to recognize these claims against the United States made by the sugar manufacturers, because the provision in regard to the payment of bounties contained in the act of 1890 is unconstitutional.

Upon this assumption it is said that no claim, legal, moral, equitable or honorable can be created in favor of the sugar manufacturer and against the government, and that where there is neither legal, moral nor honorable obligation to pay, Congress has no power to appropriate money.

In our opinion it is not correct to say that no moral, equitable or honorable obligation can attach in favor of persons situated as were the defendants in error here, when the act of 1895 was passed. We think obligations of that nature may arise out of such circumstances. We regard the question of the unconstitutionality of the bounty provisions of the act of 1890 as entirely immaterial to the discussion here. These parties did not at that time (when manufacturing under its provisions) know that the act was unconstitutional; they could not be regarded as failing to do their whole duty because they proceeded with the manufacture of sugar in reliance upon the bounty promised by the government, under an act recognized by the officers of the government as valid, and which they were at all times executing. But it is said that if the act be unconstitutional the law imputes to these parties at all times a knowledge of its invalidity, and that it is not rendered valid by acquiescence in its provisions for any length

of time even by officers of the government holding the highest places therein and who are charged with its execution and believe in its validity.  Being unconstitutional, there never was a moment, it is stated, when there was any valid act, and, therefore, no equities can arise in their favor because of any acts done by them upon the faith of the act, which they were bound to know was wholly void.  This reasoning does not exactly fit the case.  It is not a question whether any strictly legal rights can arise out of an unconstitutional act.  It is a question whether equitable considerations can attach to a claim which, among other grounds, is based upon an act that was supposed by all the officers of the government to be valid and which was repealed only when the whole taxing act of 1890 was subjected to a careful and comprehensive revision.  There are occasions when the presumption that every man knows the law must be enforced for the safety of society itself.  An individual on trial for a violation of the criminal law will not be heard to allege as a defence that he did not know the act of which he was guilty was criminal.  But in such a case as this, knowledge of the invalidity of the law in advance of any authoritative declaration to that effect will not be imputed to those who are acting under its provisions, and receiving the benefits provided by its terms.  These parties cannot be held bound, upon the question of equitable or moral consideration, to know what no one else actually knew, and what no one could know prior to the determination, by some judicial tribunal, that the law was unconstitutional.  Although it should finally turn out that the law is invalid, and is so pronounced, yet during all the time of its operation, as has been stated, all the officers of the government united in treating it as a valid act.  No court had determined to the contrary.  It was a question at least admitting of argument.  Under such circumstances can it be said that the plaintiffs in these suits and persons situated like them were bound to know that this law was and would be pronounced unconstitutional, and that no rights could be acquired under it, and that they would not be justified in proceeding to manufacture sugar according to its provisions?  Could no equities

be built up in their behalf (which the government might subsequently recognize) founded upon the belief that the act was valid, and upon the action of the officers of the government under it, because it was, or subsequently might be pronounced to be, unconstitutional?

We are of the opinion that the parties, situated as were the plaintiffs in these actions, acquired claims upon the government of an equitable, moral or honorary nature. Could Congress legally recognize and pay them although the act of 1890 as to its bounty provisions might be unconstitutional? It is true that in general an unconstitutional act of Congress is the same as if there were no act. That is regarding it in its purely legal aspect. Being in violation of the Constitution, that instrument must govern, and no one can base any legal claim as arising out of such an act. That is a very different principle, however, from that which we think governs in this case. The persons for whose benefit the appropriation contained in the act of 1895 was made are not, in the view we take, asserting the existence of a legal and valid debt against the United States which is at the same time based upon an unconstitutional act of Congress. No such inconsistent and illogical position is taken. They are asserting that by reason of the occurrences which took place before the appropriation, among which was the passage of the act of 1890, they were so placed before Congress, as to authorize that body to recognize the equities of the situation, and to pay their claims which, while they were not of a legal character, were nevertheless of so meritorious and equitable a nature as to authorize the nation through its Congress to appropriate money to pay them.

It is also true that it does not appear from the terms of the act of appropriation that the parties for whose benefit it is made had commenced the business of sugar manufacturing or enlarged their previous manufacture of sugar by reason of the bounties provided under the act of 1890. That was not necessary. There was enough in the circumstances which are before this court and which have been already in part detailed to make it a question for the decision of Congress,

whether upon the whole the persons so situated were equitably entitled to its consideration and to the appropriation asked for. If Congress possessed the power in any event to recognize equities of such a nature, we think it had enough in the case before it to uphold a favorable decision thereof. It is unnecessary to hold here that Congress has power to appropriate the public money in the treasury to any purpose whatever which it may choose to say is in payment of a debt or for purposes of the general welfare. A decision of that question may be postponed until it arises.

There was enough in the case as presented to Congress upon which to base the assertion that there was a moral and honorable claim upon the public treasury which that body had the constitutional right to recognize and pay.

Under the provisions of the Constitution, (article 1, section 8,) Congress has power to lay and collect taxes, etc., "to pay the debts" of the United States. Having power to raise money for that purpose, it of course follows that it has power when the money is raised to appropriate it to the same object. What are the debts of the United States within the meaning of this constitutional provision? It is conceded and indeed it cannot be questioned that the debts are not limited to those which are evidenced by some written obligation or to those which are otherwise of a strictly legal character. The term "debts" includes those debts or claims which rest upon a merely equitable or honorary obligation, and which would not be recoverable in a court of law if existing against an individual. The nation, speaking broadly, owes a "debt" to an individual when his claim grows out of general principles of right and justice; when, in other words, it is based upon considerations of a moral or merely honorary nature, such as are binding on the conscience or the honor of an individual, although the debt could obtain no recognition in a court of law. The power of Congress extends at least as far as the recognition and payment of claims against the government which are thus founded. To no other branch of the government than Congress could any application be successfully made on the part of the owners of such claims or debts

for the payment thereof.   Their recognition depends solely upon Congress, and whether it will recognize claims thus founded must be left to the discretion of that body.   Payments to individuals, not of right or of a merely legal claim, but payments in the nature of a gratuity, yet having some feature of moral obligation to support them, have been made by the government by virtue of acts of Congress, appropriating the public money, ever since its foundation.   Some of the acts were based upon considerations of pure charity. A long list of acts directing payments of the above general character is appended to the brief of one of the counsel for the defendants in error.   The acts are referred to not for the purpose of asserting their validity in all cases, but as evidence of what has been the practice of Congress since the adoption of the Constitution.   See, also, among other cases in this court, *Emerson* v. *Hall,* 13 Pet. 409; *United States* v. *Price,* 116 U. S. 43; *Williams* v. *Heard,* 140 U. S. 529.   The last cited case arose under an act of Congress in relation to the Alabama claims.

The claims presented on the part of the United States against Great Britain, arising out of the depredations committed by the Confederate vessel Alabama and other designated Confederate vessels, which had sailed from British ports, upon the commerce and navy of the United States during the war of the rebellion, were by the treaty of Washington, concluded May 8, 1871, between the United States and Great Britain, submitted to a tribunal of arbitration called to meet at Geneva, in Switzerland.   Certain indirect claims or war risks, as they were sometimes called, were included by this government in its claims against Great Britain and were presented to the tribunal above named.   Great Britain objected to the submission of those claims on the ground that their consideration was not included in the purview of the treaty.   This matter was the subject of some difference of opinion among the representatives of the respective governments, and they were not able to agree upon the subject, when the arbitrators, without expressing any opinion upon the point of difference as to the interpretation of the treaty, stated that these indirect or war

claims did not constitute upon principles of international law applicable to such cases a foundation for an award of compensation or computation of damages between nations, and should, upon such principles, be wholly excluded from all consideration of the tribunal in making its award, even if there were no disagreement between the two governments as to the competency of the tribunal to decide them. This declaration was accepted by the President, and those claims were not insisted upon before the tribunal and were not taken into consideration in making the award. Thus it is seen that there were no legal claims of the holders of those war risks upon the government for the payment to them of any sum whatever. The award made by the tribunal, which was paid to the United States by Great Britain, was held to have been made to the United States as a nation, *United States* v. *Weld*, 127 U. S. 51, and the fund itself came into the treasury as any public moneys of the country.

By the act of June 5, 1882, c. 195, 22 Stat. 98, the Court of Commissioners of Alabama Claims was reëstablished, and the duty was imposed upon it to receive and examine claims which might be presented, putting them into classes, the second of which was "for the payment of premiums for war risks, whether paid to corporations, agents or individuals, for the sailing of any Confederate cruiser." The Heards were owners of claims for war risks, and Congress finally appropriated money to pay a portion of them. Congress thus recognized as proper to be paid a class of claims which had not been taken into consideration by the Geneva tribunal, but which had been decided by that tribunal to have no basis in international law. It is a case, therefore, of the recognition by Congress of what it regarded as an equitable claim on the part of the owners of these war risks to be paid some portion of their claims, and the validity of the appropriation was never questioned.

Among the latest examples of payments that are not of right or of any legal claim, but which are in the nature of a gratuity depending upon equitable considerations, are the cases just decided by this court of *Blagge* v. *Balch, Brooks* v.

*Codman,* and *Foote* v. *Women's Board of Missions,* reported as one case in 162 U. S. 439. The claims in those cases are what have been known as the French spoliation claims, being based upon depredations of French cruisers upon our commerce prior to July, 1801. An appropriation for their payment was made by Congress in 1891 upon the conditions and to the class of persons named in the act. Questions arose as to the proper interpretation of the act and as to the character of the payments provided for therein. This court held the payments were purposely brought by Congress within the category of payments that are not of right, but which are in the nature of a gratuity and as an act of grace, though founded upon a prior moral or honorable obligation to pay to some one who might be said in some way to represent the original sufferers. No question of the power of Congress to make such appropriation was raised by any one.

The power to provide for claims upon the State founded in equity and justice has also been recognized as existing in the state governments. For example, in *Guilford* v. *Chenango County,* 13 N. Y. 143, it was held by the New York Court of Appeals that the legislature was not confined in its appropriation of public moneys to sums to be raised by taxation in favor of individuals to cases in which legal demands existed against the State, but that it could recognize claims founded in equity and justice in the largest sense of these terms or in gratitude or in charity.

Of course, the difference between the powers of the state legislatures and that of the Congress of the United States is not lost sight of, but it is believed that in relation to the power to recognize and to pay obligations resting only upon moral considerations or upon the general principles of right and justice, the Federal Congress stands upon a level with the state legislature.

In truth, the general proposition that Congress can direct the payment of debts which have only a strong moral and honorable obligation for their support is not, as we understand it, denied by the learned counsel for the United States; but it is claimed that in these cases no foundation whatever is laid

for its application, because the claim arises out of the unconstitutional provisions of the act giving bounties in 1890. It is impossible, it is said, to build even an equity out of an act of Congress which is utterly void; that as the original act offering and paying bounties was void, it cannot become legal to pay them because of any alleged equities of those who would suffer from their sudden discontinuance as set forth in these cases. For the reasons already given we do not think, under the circumstances surrounding these cases, that the validity of the act of 1895 can be questioned successfully.

In regard to the question whether the facts existing in any given case bring it within the description of that class of claims which Congress can and ought to recognize as founded upon equitable and moral considerations and grounded upon principles of right and justice, we think that generally such question must in its nature be one for Congress to decide for itself. Its decision recognizing such a claim and appropriating money for its payment can rarely, if ever, be the subject of review by the judicial branch of the government. Upon the general principle, therefore, that the government of the United States, through Congress, has the right to pay the debts of the United States, and that the claims in these cases are of a nature which that body might rightfully decide to constitute a debt payable by the United States upon considerations of justice and honor, we think the act of Congress making appropriations for the payment of such claims was valid without reference to the question of the validity or invalidity of the original act providing for the payment of bounties to manufacturers of sugar, as contained in the tariff act of 1890. The judgments in these cases are right, irrespective of how that question might be decided, or of any conclusion that might be reached upon other questions suggested at the bar.

The judgments are, therefore,

*Affirmed.*

MR. JUSTICE WHITE did not sit in nor take any part in the decision of these cases.