## UNITED STATES v. STATE BRIDGE COMMISSION OF MICHIGAN.

### Civ. A. No. 8522.

United States District Court
E. D. Michigan, S. D.

Jan. 23, 1953.

Philip A. Hart, U. S. Atty., and Nicholas J. Wagener, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Watson & Inman, Port Huron, Mich., Rudolph J. Inman, Port Huron, Mich., for defendant.

LEVIN, District Judge.

The defendant, hereinafter referred to as the Commission, is an instrumentality of the State of Michigan, having the power to sue and be sued and to do all acts necessary for the construction, operation and maintenance of a bridge known as the Blue Water Bridge across the St. Clair River between Port Huron, Michigan, and Sarnia, Ontario. An act of Congress assented to the construction of the bridge and it was opened to vehicular highway traffic on October 10, 1938, as a publicly owned toll bridge on a self-liquidating basis. The Federal act and the agreement between the State of Michigan and the Minister of Highways of the Province of Ontario provide that when the bonded indebtedness is liquidated the use of the bridge shall be without charge to the public.

The Commission, as lessor, entered into a lease dated April 24, 1945, with the plaintiff, hereinafter referred to as the Government, as lessee, for the use of the premises as a customs house at the Port Huron terminal of the bridge. The lease was for a term of one year beginning July 1, 1945, at an annual rental of $5,500, payable monthly at the rate of $458.33. It was subject to termination by either party upon thirty days' written notice and was subject to nine annual extensions at the option of the Government.

The Government, pursuant to the provisions of the lease, paid $5,041.63 as rental for the premises during the first eleven months of the occupancy and then, under the direction of the Controller General of the United States Government, refused to pay $458.33, the rent for the twelfth month of the term, for the reasons hereinafter set out. Before the discontinuance of the payment of the rent, and on March 20, 1946, the Commissioner of Customs, in behalf of the Government, notified the Commission that the Government elected to exercise its option to extend the term of the lease for one year beginning with July 1, 1946, and reserved to itself the right of further extensions in accordance with the provisions of the lease.

The Government now says that the lease was not "authorized by law" nor was its execution "under an appropriation adequate to its fulfillment." [1] This suit is brought for the recovery of the amount paid and the Commission has filed a counterclaim for the twelfth month of the term, namely $458.33.

The Government grounds its position on:

1. A prior adjudication of the nonliability of the plaintiff to pay rent as determined by the Court of Claims in an action, instituted by the Commission against the Government, on an obligation implied in fact.

2. The fact that an appropriation by Congress of certain moneys was not identifiable as rent to be paid to the Commission under the lease.

The facts elicited from a written stipulation of facts, oral presentations by counsel and exhibits in evidence leave me with the opinion that payments under the lease were made in accordance with the law.

The State of Michigan and the Government paid the cost of constructing the American approach and buildings, and the Province of Ontario and the Dominion of Canada assumed similar costs on the Canadian side. The Government's contribution consisted of approximately $345,000, which was made under the program of Federal aid to highways under the provisions of Sec. 1(e) of the Act of June 8, 1938, 52 Stat. 633, 634, 23 U.S.C.A. § 2.

The Administration Building as planned and built was a two-story structure, the first floor for the use of both the Govern-

1. Title 41 U.S.C.A. § 11. "No contract or purchase on behalf of the United States shall be made, unless the same is authorized by law or is under an appropriation adequate to its fulfillment, except in the Army, Navy and Air Force Departments, for clothing, subsistence, forage, fuel, quarters, transportation, or medical and hospital supplies, which, however, shall not exceed the necessities of the current year."

ment and the Commission, and the second floor for the exclusive use of the Government's Customs and Immigration Services. The building was to remain the property of the Commission.

The Customs and Immigration Services of the Government have occupied space in the buildings on the American approach since the bridge was opened. No agreement for payment of rent for the premises was made at the time of the construction or at the time the Government entered into the occupancy of the premises. Since the Commission is the operator of a bus line carrying passengers for hire across the bridge, it must, under the provisions of Title 8 U.S.C.A. § 160, as a common carrier furnish without charge suitable premises for the Immigration Service to carry on its inspectional activities, and no claim for rent for premises occupied by the Immigration Service has been made by the Commission. It appears, however, that there is no statutory provision or settled pattern for the payment of rent by the Customs Service for the use of the terminal facilities at international bridges and other crossings. Prior to the execution of the lease the defendant had made a number of attempts to obtain a rental agreement from the Commissioner of Customs.

On the 1st day of September, 1942, the Commission instituted suit against the Government in the United States Court of Claims on the theory that, while there was no agreement to pay rent, the Commission was entitled to reasonable compensation for the use of the premises.

On May 6, 1946, in a written opinion reported in 65 F.Supp. 394, 396, 106 Ct.Cl. 766, the Court of Claims held that the contribution to the cost of the approach and buildings of the Government gave it the right to use the space without further cost "in the absence of an agreement to the contrary".

Subsequent to the commencement of the suit in the Court of Claims, but before judgment, the Commission and other international bridge owners continued negotiations with the Government, through the Commissioner of Customs, with the objective of obtaining rentals for the respective spaces occupied by the Bureau of Customs. The Commissioner's attitude with respect to such requests for the payment of rent was a sympathetic one and may be illustrated by citing a letter dated June 27, 1944, which he wrote to an attorney for the owners of the Rainbow Bridge, Niagara Falls, New York, which reads in part as follows:

"The receipt is acknowledged of your letter dated June 22, 1914 (G–m) in which you suggest that a lease be negotiated for the fiscal year 1945 for rental for customs space at the Rainbow Bridge, Niagara Falls, New York.

"In reply you are advised that no funds have been appropriated in the customs appropriations for the fiscal year 1945 to pay for rent for customs space at the Rainbow Bridge, or a number of other bridges, which have heretofore given free rent to the Customs Service. When we submit an estimate this summer for the fiscal year beginning July 1, 1945, it is our intention to include amounts to pay for rent of customs quarters, not only at the Rainbow Bridge, but at the other bridges which have heretofore been furnishing quarters without charging any rent. This matter will then be placed squarely before the Bureau of the Budget and the Appropriations Committee in Congress."

The Commissioner followed this course of action and in his budget for the fiscal year beginning July 1, 1945, included an item of $33,000 for rentals at all of the international bridges where rent was not already being paid. On January 18, 1945, W. R. Johnson, the Commissioner of Customs, in explanation of the budget of the Bureau of Customs, appeared before the House of Representatives Subcommittee on Treasury and Post Office Department Appropriations of which the Honorable Louis Ludlow was Chairman.

Since his testimony, which appears in the printed transcript of the hearings, bears directly on the question of the intention of Congress to make the appropriation and authorize the execution of the lease, the

subject matter of this action, it is set out in full in the margin.[2]  He knew of the suit in the Court of Claims and also of suits brought by other agencies against the Government for rent of premises used as Customs Houses, and he advised Congress of those facts.  Congress with this knowledge approved the budget as submitted, Public Law 38, 79th Congress approved April 24, 1945, 59 Stat. 56.

On March 2, 1945, Collector of Customs Bradley wrote his superiors in the office of the Commissioner of Customs acknowledging receipt by him of a letter signed by the Assistant Commissioner of Customs, informing him that estimates of the appropriation for the fiscal year had been submitted to Congress which included rental of space theretofore furnished free to the Customs Service at the Commission's bridge and other similar facilities situated near-by—the Ambassador Bridge across the Detroit River between Windsor, Ontario, and Detroit, and the Detroit and Canada Tunnel under the Detroit River, also between Windsor and Detroit.  In this letter he was directed, in anticipation of receiving approval from Congress for the payment of rent for the next fiscal year, to communicate this information to the owners of the named facilities, and to enter into leases with each one of the designated owners for space for the Customs Service, at an annual rental of $5,500, effective with the beginning of the fiscal year 1946.

After an extended correspondence between Collector of Customs Bradley and his superiors in the office of the Commissioner of Customs, during which certain corrections in the lease were ordered by the Office of the Commissioner, the lease was ex-

2.  "Page 372 Increase In Cost Of Rent
"Mr. Ludlow.  You also have an item for the increased cost of rent in the field, amounting to $33,000.  What is the explanation of that?
"Mr. W. R. Johnson.  That has to do with facilities at international bridges.
"Mr. Ludlow.  Amounting to $33,000?
"Mr. W. R. Johnson.  Yes, sir.  We have twice asked Congress to enact legislation to require all international bridges to furnish us with free quarters for customs facilities required at those bridges.  The last occasion was in May 1944 in connection with the enactment of Public Law No. 328 on June 3, 1944, having to do with nonreimbursable overtime services.
"Congress did not enact the bridge provision and we therefore now propose that this money be made available so we can deal with the bridge people.  Now we are paying rent at some bridges and we are refusing to pay rent at other bridges, and some of them in the last category are now suing us in the Court of Claims.  The pendency of that litigation continues at the present time.  We think the fair thing to do is to make those payments, beginning next July.
"Mr. Ludlow.  Will $33,000 take care of the situation?
"Mr. W. R. Johnson.  It will cover our estimate but, on the basis of the suit in the Court of Claims, I doubt whether it will cover the estimates of the bridge people.  We believe we can reach an agreement within the limit of that amount.
"Mr. Ludlow.  What is the explanation of the advance fund, for which the amount estimated is $300,000?
"Mr. W. R. Johnson.  That is the amount of the lag in the payment of reimbursable overtime that we have just discussed.
"Page 377 Rents And Utility Services
"Mr. Ludlow.  There is an increase in the estimate for rents and utility services from $199,000 for the fiscal year 1945 to $232,000 for the fiscal year 1946.
"Is that the amount for rent for space rent?
"Mr. W. R. Johnson.  That is covered by the bridge item I mentioned before.
"Page 381
"Mr. Ludlow.  Of course, that does not increase the cost of your service at all; it just means an advancement of funds.
"Mr. W. R. Johnson.  It does not increase the cost of the service at all; it does permit us to use the appropriated funds more effectively.
"The little item of $33,000 on the bridge rental: I think the bridge people are entitled to that, in all fairness.  It does not mean a lot, one way or the other, because we happen to have these people by the throat, so to speak.
"Mr. Ludlow.  And you do not wish to appear to be highwaymen?
"Mr. W. R. Johnson.  That is it exactly, Mr. Chairman.
"Mr. Ludlow.  Thank you very much."

cuted on April 24, 1945, the same day the appropriation was approved.

The Commission furnished janitor service, heat, light, and other incidentals, and made repairs when called upon by the Government in compliance with the provisions of the lease, and there is no suggestion that the Commission did not fully comply with its obligations under the lease.

■ The Government's position that the decision of the Court of Claims is a complete adjudication of the obligation of the Government to pay rent is without merit. Such was not the holding of that court. The doctrine of res adjudicata, suggested as determining the issue here, is not applicable because the question presented in the instant case is an entirely different one than that considered by the Court of Claims. Neither the lease nor the question of its validity were before that court. Congress knew of the action pending before the Court of Claims and, nevertheless, decided to compensate the Commission for what it deemed to be the fair rental value of the property. The decision of the Court of Claims did not preclude the action of Congress. Mr. Chief Justice Stone, speaking for the court in Pope v. United States, 323 U.S. 1, 9, 65 S.Ct. 16, 21, 89 L.Ed. 3, said:

"We perceive no constitutional obstacle to Congress' imposing on the Government a new obligation where there had been none before, for work performed by petitioner which was beneficial to the Government and for which Congress thought he had not been adequately compensated. The power of Congress to provide for the payment of debts, conferred by § 8 of Article I of the Constitution, is not restricted to payment of those obligations which are legally binding on the Government. It extends to the creation of such obligations in recognition of claims which are merely moral or honorary. Roberts v. United States, 92 U.S. 41, 23 L.Ed. 646; United States v. Realty Co., 163 U.S. 427, 16 S.Ct. 1120, 41 L.Ed. 215; United States v. Cook, 257 U.S. 523, 42 S.Ct. 200, 66 L.Ed. 350; Cincinnati Soap Co. v. United States, 301 U.S. 308, 314, 57 S. Ct. 764, 767, 81 L.Ed. 1122."

■ The fact that the appropriation for rent paid to the Commission was not earmarked by Congress for particular disbursement to the Commission is of no significance. Congress is not required to set out with particularity each item in an appropriation as a requisite of validity. It is enough that the appropriation be identifiable sufficiently to make clear the intent of Congress. The testimony of the Commissioner of Customs before the House Subcommittee clearly indicated that the requested appropriation was for the payment of rent for the use by the Government of facilities at international bridges The bridge of the Commission was one of those bridges.

The Commissioner of Customs, who was charged with the responsibility of presenting the budget for the Bureau to Congress, included in it the amount of rent subsequently paid to the Commission and made a fair presentation of the facts to Congress. He obtained authority from it to pay the rent and, in the light of all the circumstances, to uphold the position of the Government would make it well nigh impossible for Government agencies to carry on their business with the public, and hazardous indeed for any government employee, even after having been officially advised of an appropriation, to act on behalf of the Government unless the act of Congress set forth the minute details of each particular transaction. How unsound such a practice would be is illustrated in the instant case by the fact that Collector of Customs Bradley has already been notified by the General Accounting Office of the Government that he is held personally responsible for the execution of the lease, and demand has been made upon him and the company which furnished his qualifying surety bond for the sums paid to the Commission, and this notwithstanding the fact that he at all times carried out the instructions of the Commissioner of Customs as he was obliged to do. Customs Manual of 1943, Sec. 27.24(b) " * * * The instructions, decisions and regulations of the Sec-

retary of the Treasury and of the Commissioner of Customs are binding on collectors."

The Government, however, in filing this suit did not subject itself to an allowance of a cross-claim. The United States may be sued only to the extent it has consented to be sued, and there appears to be no congressional authority modifying the immunity rule in favor of cross-actions beyond the amount necessary as a setoff. United States v. Shaw, 309 U.S. 495, 502, 60 S.Ct. 659, 84 L.Ed. 888. Rule 13 of the Federal Rules of Civil Procedure, with respect to counterclaims and cross-claims, expressly provides: "(d) These rules shall not be construed to enlarge beyond the limits now fixed by law the right to assert counterclaims or to claim credits against the United States or an officer or agency thereof."

An order may be presented dismissing the action of the Government and also the counterclaim of the Commission.