Richardson, J.,
delivered the opinion of the court:
The claimant is the receiver of the National Bank oftheState of Missouri, in Saint Louis. Ho was duly appointed on the 23d day of June, 1877, by the Comptrollerof the Currency, who then ■officially declared the bank to be insolvent and unable to pay its just and legal 'debts.
By the following sections of the Revised Statutes, national banks are required to pay to the Treasurer of the United States each half year, in the months of January and July, certain taxes on the average amount of their circulation, deposits, and capital stock, and it is made the duty of the president or cashier of each bank to make semi-annual returns of the average amount •of each item which is thus subjected to taxation:
“ Sec. 5214. In lieu of all existing taxes, every association shall jiay to the Treasurer of the United States, in the months of January and July, a duty of one-half oí one per centum each half year upon the average amount of its notes in circulation, and a duty of one-quarter of one per centum each half year upon the average amount of its deposits, and a duty of one-quarter of one per centum each half year on the average amount of its capital stock beyond the amount invested in United States bonds.
“ Sec. 5215. In order to enable the Treasurer to assess the duties imposed by the preceding section, each association shall, within ten days from the first days of January and July of each year, make a return, under the oath of its ’president or cashier, to the Treasurer of the United States, in such form as the Treasurer may prescribe, of the average amount of its notes in circulation, and of the average amount of its deposits, and of the average amount of its capital stock, beyond the amount invested in United States bonds, for the six months next preceding the most recent first day of January or July. Every association which fails so to make such return shall be liable *168 to a penalty of two hundred dollars, to be collected either out of the interest as it may become due such association on the bonds deposited with the Treasurer, or, at his option, in the manner in which penalties are to be collected of other corporations under the laws of the United States.
“ Sec. 5216. Whenever any association fails to make the half yearly return required by the preceding section, the duties to be paid by such association shall be assessed upon the amount of notes delivered to such association by the Comptroller of the Currency, and upon the highest amount of its deposits and capital stock, to be ascertained in such manner as the Treasurer may deem best.
“ ¡Sec. 5217. Whenever an association fails to pay the duties imposed by the three preceding sections, the sums due may be collected in the manner provided for the collection of United States taxes from other corporations; or the Treasurer may reserve the amount out of the interest as it may become due on the bonds deposited with him by such defaulting association.”
When the taxes on national banks became due and payable in July, 1877, this bank w-as no longer .in the control of its former officers, and neither the president nor cashier was in a condition to make the returns upon which the taxes were to be based, and none were made by them.
In the following month of September the receiver made ihe return which the statute requires to be made by the president or cashier, in which, after specifying the average amount of circulation and deposits, upon which the taxes assessable were $6,033.33, he set down the “averageamount of paid-up capital stock” as “none.” The fact was, as the Treasurer was further informed by the Comptroller of the Currency, that the whole capital of the baiik had been lost, and that it had no capital during the fractional part of the six months ending June 23, 1877.
Notwithstanding these facts, the Treasurer demanded payment of taxes from the bank, not only upon its average circulation and deposits for the six months immediately preceding July 1, 1877^ but upon its nominal capital stock also, amounting in all to $11,569.87. This sum he requested the Comptroller of the Currency to pay, but payment was refused.
There was a large sum of money collected by the receiver from various assets of the bank deposited in the Treasury of the United States to the credit of the Comptroller, and there *169 made subject by statute to the order of that officer alone. (Bev. Stat., § 5234.) '
On the 12th of January, 1878, the Treasurer, without any order, and against the objection of the Comptroller, charged to this deposit the whole amount of the tax so assessed, and took a certificate of deposit therefor from the assistant treasurer.
On the Í4th of January, 1878, he transmitted this certificate to the Secretary of the Treasury, with “ the request that the amount be suspended and not covered into the Treasury for the present.”
The efforts of the Treasurer thus to enforce payment were resisted by the Comptroller, who addressed a letter to the Secretary on the 17th of January, setting forth this objection and requesting that the amount “ be suspended and not covered into the Treasury until the question of the payment of semiannual duty by insolvent national banks shall be determined either by the courts or by legislation now pending in Congress.” On the 18th of January the Secretary made his reply in writing, stating that the amount would not for the present be covered into the Treasury; and it was retained by him without official action until after the passage of the Act of March 3, 1879, ch. 125, in the 22d section of which is the following provision :
" That whenever and after any bank has ceased to do business by reason of insolvency or bankruptcy, no tax shall be assessed, collected, or paid into the Treasury of the United States on account of such bank which shall diminish the assets thereof necessary for the full payment of all its depositors, and such tax shall be abated from such national banks as are found by the Comptroller of the Currency to be insolvent.” (Supplmt. to Bev. Stat., 449.)
Afterward the Comptroller of the Currency found and made certificate that from the assets and resources of said bank, including the individual liability of its shareholders, sufficient moneys have not been realized, and will not be realized, to pay the depositors of said bank in full the amounts due them for deposits and the interest thereon; and that the tax alleged to be due from said bank for the half year ending July 1, 1877, to wit, the sum of $11,569.87, will, if paid, diminish the assets of said bank necessary to pay the depositors of said bank in full, without interest.” This certificate was an official act of *170 the Comptroller, and even if not conclusive of the facts certified to, it was at least prima facie evidence and is not impeached.
On the 11th of March, the Comptroller addressed a letter to the Secretary of the. Treasury calling his attention-to the new enactment and the insolvent condition of this bank, and requesting- him to return the certificates of deposit for unpaid taxes on insolvent national banks, which had been retained by him at the request of the Comptroller and the Treasurer. This the Secretary declined to do, and on the 14th of June, 1879, the same was covered into the Treasury by a regular covering-in warrañt.
The question whether or not the nominal capital stock of an insolvent national bank is subject to a semi-annual tax thereon, when the whole real capital has been lost, and nothing remains for the stockholders, and they may be liable to assessments for the payment of the debts, was not much argued on either side, and has not been considered by us. Nor have we considered whether or not the Treasurer, even if the tax claimed by him was a legal liability of the bank, had the right to charge it against the deposit to the credit of the Comptroller without the authority of that officer and against his protest.
The view we take of the case renders it unnecessary to pass upon either of these questions.
Whether the Treasurer had a right to take the money from the Comptroller’s account or not, he has done so, and the Secretary of the Treasury has formally and effectively covered it into the Treasury, where it is beyond the reach of any executive officer to recover it without an appropriation by Congress. How the money reached the Treasury, whether by a right or wrong process, is immaterial. -If the defendants’ claim for the tax was valid when the money was covered into the Treasury, or is valid now, they may retain the money. If the tax was and is invalid for any reason whatever, or has been abated, then the defendants have money belonging to the claimant which they cannot in equity and good conscience retain, and this action in the nature of assumpsit for money had and received to the claimant’s use may be maintained.
If it be conceded that the tax in question was rightly assessed in the first instance, the only inquiry is whether or not it was abated by the act of March 3, 1879.
It is urged on the part of the defendants that the act is to be *171 construed as prospective and not applicable to taxes assessed upon national banks declared insolvent before its passage. Admitting the correctness of tbe first part of this proposition, the second does not necessarily follow.
A statute does not operate retrospectively when it is made to apply to future transactions, merely-because those transactions have relation to and are founded upon antecedent events; or, as was said by Denman, Ch. J., in Reg. v. Whitechapel, 12 Q. B., 127, “because a part of the requisites for its action is drawn from time antecedent to its passing.”
Acts relieving individuals from obligations to the government or the public, in whole or in part, without affecting the vested rights of other persons, and similar acts mitigating the punishment for offenses, as well as acts relating to the administration of the government, and generally those affecting the proceedings of courts, apply with equal force to existing cases as to those which may arise in the future. In point of fact, it is well known that most of such acts are suggested by, if not passed expressly to meet, existing difficulties, hardships, or inconveniences. Such application is not retroactive in the sense in which that term is used in the canon of construction of statutes, that an act is to be held to operate prospectively only unless the contrary appears. The vested rights of individuals are not interfered with thereby, and only the inchoate rights of the government and the public are modified. The legislative power may change or release obligations to the public at pleasure ; and when an act is passed to relieve persons from what seems to be an unjust or harsh imposition under an existing law, it must generally be held to relieve all such impositions previously made and not then consummated, but which still remain to be executed or enforced.
A remedial statute must be construed liberally, so as to afford all the relief within the power of the court, which the language of the act indicates that the legislature intended to grant. Courts will look into the occasion for the passage of such an act, and will consider the evils or wrongs which it seeks to remedy, their nature and extent, in order to determine how far it was intended that the act should reach, whether only to cases thereafter to arise, or to existing cases, or retrospectively to cases entirely passed and consummated. (Stewart v. Kahn, 11 Wall., 493; People v. Supervisors, &c., 70 N. Y., 228.)
*172 The reason for a law is such an important element in its interpretation that Lord Coke well said, “Knowing for a certainty that the law is unknown to him that knoweth not the reason thereof.” (Coke on Littleton, closing paragraph.)
The act of March 3, 1879, now under consideration, was passed for the undoubted purpose of relieving depositors in national banks from the payment of certain taxes, not assessed upon them, but upon the banks of which they are only customers; taxes which, under the pre-existing law, they would indirectly be obliged to pay when a bank is so insolvent that all its capital is gone and it has nothing left with which to pay taxes, except the money of its depositors.
These semi-annual taxes are assessed against national banks in their corporate capacity, upon their capital and business, in consideration of the franchise and benefits which the government grants to them, and for other reasons. They are expected to come out of the profits of the bank, and thus reducing the dividends of the- stockholders, they are a tax upon the proprietors of the institutions. It was never intended thus to tax the customers and creditors of the banks. When, therefore, it was found that in case of insolvency of the bank and the loss of its. entire capital, and its inability to pay its depositors in full’ from all its assets, an enforcement of the taxes would result in the taxation of the depositors, the customers and creditors of the bank, this act to relieve them was passed.
No reason can be conceived why depositors of the then existing insolvent banks should not be thus relieved, as well as those of banks which should thereafter become insolvent. There is nothing in the act to require future depositors to do anything to prevent the recurrence of' the same difficulty, or to protect themselves or the government, and there was nothing which depositors in the then existing insolvent banks could have done to prevent the insolvency. Depositors of both classes were equally blameless, and this remedy would seem justly to apply equally to both, as we hold that it does.
The only remaining question is whether or not this tax had been paid before the passage of the act of March 3, 1879, since, if payment had been previously consummated, then a case did not exist to which the act could apply. The language is that “no tax shall be assessed, collected, or paid into the Treasury of the United States on account of such bank which shall di *173 minish the assets thereof necessary for the full payment of its depositors, and such tax shall be abated from such national banks as are found by the Comptroller of the Currency to be insolvent.” Therefore, taxes which had been assessed and previously paid into the Treasury of the United States were not abated by the act.
All that had been done toward payment of this tax was that the Treasurer of the United States, without the order or authority of the Comptroller of the Currency, and contrary to his express protest, undertook to charge it to the bank in the account of its money on deposit in the public Treasury to the credit of the Comptroller, and to take a certificate of deposit from the assistant treasurer for the amount. That the Treasurer did not consider this to be final payment is clear from his letter to the Secretary, in which, transmitting the certificate, he expressly requests “that the amount be suspended and not covered into the Treasury for the present.” The comptroller added his request to that of the Treasurer, and in a letter to the Secretary he asked that “these various amounts be suspended and not covered into the Treasury until the question of payment of semiannual duty by insolvent national banks shall be determined either by the courts or by legislation now pending in Congress.” The Secretary acceded to these requests, and wrote to the Comptroller of the Currency that the money would not be covered into the Treasury by warrant for the present.
Thus it seems to have been understood and agreed among those three officers — the Secretary of the Treasury, the Comptroller of the Currency, and the Treasurer — that the matter should be held in suspense and within their control until some future time. It was so held to a period several months after the passage of the statute referred to.
An act is not consummated where anything in relation to it remains to be done. It is not ordinarily necessary to the consummation of payment that money received by public officers in discharge of a debt to the government should be formally “ covered into the Treasury” by a covering-in warrant. But in this case, where one public officer charged a sum of money in payment of a tax to the official trust account of another public officer, without his consent, took a certificate of deposit for it, and requested the Secretary to suspend covering itinto the Treasury, and those three officers agreed that the matter should be sus *174 pended, we tliinb that payment was not intended to be consummated until the act of formally covering the money into the the Treasury was effected by the action of thé Secretary. Until the money was thus covered into the public Treasury, it was within the control of the Secretary, who might have returned the certificate of deposit to the Treasurer, to be by him canceled and annulled.
The tax in question was then, at the time of the passage of the act of March 3, 1879, a tax assessed (assuming the assessment to have been legal), but not paid, and so the statute by its express terms operated upon it to abaté it. There was, therefore, nothing due on that account from the bank when the money which the claimant now sues for was covered into the Treasury, and as the defendants retain the claimant’s money without right, he may recover in this action. Judgment will be entered in his favor for the sum .of $11,569.87.