Nott, Ch. J.,
delivered the opinion of the court:
This case comes before the court upon demurrer. The petition alleges that on the 1st day of June, 1890, the claimant made an entry under the Desert-Land Act, 3d March, 1877 (19 Stat. L., 377), of 236.55 acres in the State of Utah and paid into the hands of the receiver of the land office $118.28, being 50 cents per acre, in preliminary payment upon the said land.
The petition further alleges that the land so entered was a part of an even-numbered section of land within the limits of the grant to the Union Pacific Bailway Company.
The petition also alleges that the allowance of an entry under the Desert-Land Act upon a reserved section within the limits of a railroad land grant being an erroneous and illegal act on the part of the executive officers, the claimant acquired no right or title to the land so entered by him; and accordingly that he has not reclaimed said land by conveying water thereon, and has not made final proof and final payment thereon, but has allowed the said entry to be canceled by the Commissioner of the General Land Office, and now has no right or title in or to the said land.
*158 The petition also alleges that the defendants have received from the claimant the sum of $118.28 upon the aforesaid illegal and void contract of entry; that the contract or entry has been and now is disallowed by the claimant and has not been carried into effect; that the consideration for the payment made by the claimant was illegal and void, and that the defendants now retain and withhold the said sum of $118.28 belonging to the claimant contrary to equity and good conscience.
The defendants in support of their demurrer contend that the court is without jurisdiction of the case for the reason that the obligation on which it is founded is not an implied contract within the intent of the Tucker Act, 3d March, 1887 (24 Stat. L., 505, § 1). On the argument the question was also discussed, properly going to the merits, whether the petition sets forth a good and sufficient cause of action, i. e., whether the entry under the Desert-Land Act was void because the laud lies within the limits of a railway grant. Though the demurrer goes only to the jurisdiction, the court, to avoid the inconvenience of a second submission of the case, will now consider this question.
The claimant relies upon the recent decision of the Supreme Court in the case of Healey (160 U. S., 136) to sustain his proposition that the .entry was void. The counsel for the defendants insists that that question was not presented to the Supreme Court by the Healey Case, and that the decision does not sustain the claimant’s position.
The statute which is supposed to exclude railway grants from the operation of the Desert-Land Act is the proviso to section 2357, Revised Statutes. It is in these words:
“Provided, That the price to be paid for alternate reserve lands along the line of railroads, within the limits granted by any act of Congress, shall be two dollars and fifty cents per acre.”
The Desert-Land Act declares, among other things—
“That it shall be lawful for any citizen of the United States, or any person of requisite age 1 who may be entitled to become a citizen, and who has filed his declaration to become such,’ and upon payment of twenty-five cents per acre, to file a declaration under oath with the register and the receiver of the land district in which any desert land is situated, that he intends to reclaim a tract of desert land not exceeding one *159 section, by conducting water upon tbe same, within the period of three years thereafter. * * * Provided, That no person shall be permitted to enter more than one tract of land and not to exceed six hundred and forty acres, which shall be in compact form.
“Sec. 2. That all lands, exclusive of timber lands and mineral lauds, which will not, without irrigation, produce some agricultural crop, shall be deemed desert lands within the meaning of this act, which facts shall be ascertained by proof of two or more credible witnesses under oath, whose affidavits shall be filed in the land office in which said tract of land may be situated.”
To this court there seems to be no conflict between the two statutes. The later does not repeal the earlier; the earlier does not prevent the full operation of the later. The proviso fixed the price to be paid for alternate reserved sections, along the line of railroads and within the limits of lands granted by an act of Congress, at $2.50 per acre; the Desert-Land Act allowed a person who intended to reclaim desert land by conducting water upon it to enter an entire section; and this notwithstanding the fact that the then existing law (Kevised Statutes, §§ 2259, 2279) restricted the privilege of preemption to a quarter of a section. The exclusive subject of the proviso was price; the principal subject of amendment in the Desert-Land Act was quantity. The theory of the one statute was that the coming of a railroad would increase the value of all kinds of land in the vicinity, and Congress estimated this augmentation of value at 100 per cent, and accordingly the Government gave away one-half of its lands to obtain a railroad, and then doubled the price of the alternate sections which it retained. The theory of the Desert-Land Act was that a purchaser would not find sufficient inducement in a quarter of a section to engage in the work of reclaiming desert land .by conducting water thereon, and the necessary inducement was estimated to be the right to enter upon and acquire title to an entire section. The result of the two statutes, in the opinion of this court, is that a man may enter an entire section of desert land anywhere, but that if it lies within the limits of a railroad grant he must pay the double-minimum price.
Nevertheless the Supreme Court has said of these statutes in the Healey Case (160 U. S., 136):
“An examination of the statutes regulating the sale of the public laud is necessary in order to determine the question now *160 g ^ <3> « 02 & O J" 8» jgf :3 5-ti3 2 crq ® <2 ^ 02 <i o § ® ' el.P'S® p. ET® • (D (J p (HO 5 g fcQ ' :.-§ g-LCE® o’ ■» gt- C+- p ?®ga ® P 5 P'S i S' l o ~ ® s ® a cro 3 & j pi, CD 3 £t >S ® ° © S3 jj JO io. 5 p ® hi ® ® £ g.CO £r® ^ o © &
And the Supreme Court has answered this question so presented by saying (p. 146):
“We perceive no difficulty in holding that the desert lands referred to in the act of 1877 are those in the States and Territories specified, which required irrigation before they could be used for agricultural purposes, but which were not alternate sections reserved by Congress in a railroad laud grant. It is as if the act of 1877 in terms excepted from its operation such lands as are described in the proviso of section. 2357 of the Revised Statutes.”
And upon the faith of these two paragraphs — this question stated and this answer given — the claimant has brought his action, and a large number of similar cases are dependent upon the decision in this. We are inclined to believe that the language of the Supreme Court was not intended to be interpreted literally; that the court did not intend to be understood assaying that an entry of desert land within a railroad grant was absolutely void, but that an entry of such lands at the minimum price of $1.25 per acre was unauthorized by law. The court speaks of something being “excepted” from the operation of the Desert-Land Act, and that something may well be understood as an exception of price and not of entry. But in the peculiar condition of this case we do not feel at liberty to vary the language of the Supreme Court by interpretation, and preclude that tribunal from interpreting its own language. A judgment against the claimant will not be appealable, and can not be reviewed in the court above; the land laws are a matter of general public concern, and the Executive Departments should not be embarrassed by decisions which can not be reviewed now, but which on some future day may be overruled. We shall therefore decide this point in favor of the claimant, and proceed to examine the primary defense of the Government, that the court is without jurisdiction.
The object to the jurisdiction of the court rests upon two words, implied contract. The Tucker Act, 1887 (24 Stat. L., 505), declares that the jurisdiction of the court shall include claims founded upon “contracts expressed or implied.” The *161 counsel for tlie Government contends that it is erroneous to say that the law implies a contract, though it may impose an obligation, and for the enforcement of the obligation provide a remedy in the nature of a contractual remedy; that this process for the enforcement of moral obligations, moral but non-contractual, enforceable quasi ex contractu, is a suit upon a quasi and not upon an implied contract, and that a quasi contract “is not a contract at all, but the imposition of a moral obligation, enforceable by a contract remedy.” Conversely, it is said “implied contracts are only those which arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract.”
Modern learning and analysis have brought to light many distinctions in the law which may or may not in practice prove to be troublesome refinements. The question whether the distinction between implied contracts and quasi contracts is a material distinction or a refinement is one which the court does not intend to discuss. The question whether this distinction did or did not exist in the legislative mind when this court was invested with jurisdiction of suits against the United States is the material question before the court, the one which it must consider and determine.
As the fact was pressed upon the court in the argument that the eminent lawyer who drafted and introduced the Tucker Act was likewise an accomplished scholar in the law of contracts, and fully aware of the distinction now relied upon by the defendants, we will first consider the Tucker Act as a grant of jurisdiction.
Considered as a jurisdictional statute; the first section of the act was not new or original legislation. It is certainly in pari materia with the various statutes embodied in the Eevised Statutes from section 1049 to section 1093, and largely a codification of existing law. The clause excepting pensions, though new in statutory terms, was not new law, for that had already been declared to be the law by the courts. (Daily's Case, 17 C. Cls. R., 144.) The statute was intended to be in enlargement and not in restriction of jurisdiction. It added to the jurisdiction of the court “all claims founded upon the Constitution of the United States,” “or for damages, liquidated or *162 unliquidated, in oases not sounding in tort, in respect of which, claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty, if the United States were suable.” As to the subject of jurisdiction now under discussion, jurisdiction founded upon contracts, the language of the Tucker Act is identical with that of the preceding statutes — “all claims founded # * * upon any contract, expressed (sic) or implied, with the Government of the United States.” We must therefore inquire, not what was in the mind of an accomplished scholar when he copied, verbatim, jurisdictional clauses from existing statutes and incorporated them into the Tucker Act, but what Congress intended when all of this preceding legislation was reenacted into this codification of jurisdictional statutes.
The common law reduces all civil actions between individuals to two simple classes, ex contractu and ex delicto. There are many subdivisions of the former, but generally it may be said that what is not ex delicto is ex contractu. It is the opinion of the court that Congress used the language “upon any contract, expressed or implied,” with reference to this general classification of the common law. The meaning is that the court shall have jurisdiction of all actions ex contractu, whether the contract be express or implied, but shall not have jurisdiction of actions ex delicto.
The sternness of the law of agency makes tbe individual employer and the private or the municipal corporation liable for the acts and negligences and laches and torts of those whom they employ, even where the principal gave no authority and acquired no advantage from the act of his agent. In the case of public agents the law is different. The Government is not liable for what its agents do without authority, unless it has acquired thereby the property of the citizen for public use, and not always then. There are ever two fundamental differences between suits against the Government and suits against persons. The first is that there is always a compact between the Government and the citizen that the former may take his property with his consent for public use on the condition of giving for it just compensation; the second that the Government is not liable for the acts of its agents to the extent of an ordinary employer, but its liability is to be measured always by the authority which it has expressly givenor by the benefit *163 which it has actually received. Where the public agent takes property for public use, as private property, though with no recognition of the owner’s title, a contract will be implied and the Government will be liable. Where the agent takes property as belonging to the Government, or in positive denial of the owner’s title, it negatives the implication of contract, and the agent will be liable. In the Langford, Case (101 U. S., 341) the officer entered upon real property to which the United States asserted title and from which they forcibly evicted the claimant, and it was held that no action on an implied contract would lie against the Government. In the Arlington Case (United States v. Lee, 106 U. S., 196) the Government claimed under a tax title, which was void, and it was held that an action in ejectment would lie against the agents in possession. In the Schillinger Case (155 U. S., 163) the public agent denied the right of an inventor in an alleged invention and through a contractor appropriated it to the use of the Government, and it was held that the taking was in the nature of a tort and the Government not liable in contract; but in the Berdan Case (156 U. S., 552), where the general policy of the Ordnance Office left inventors free to seek redress without recognizing or denying the validity of their inventions, a contract was implied and the Government held liable, although the device, manufactured, assumed to be of another person’s invention. The Tucker Act, when it provides on the one hand that the court shall have jurisdiction of all claims founded upon the Constitution of the United States and on the other excepts' suits “ sounding in tort,” does little or nothing more than provide that the court shall not be troubled with suits in which, as against the Government, there is at law no liability.
The present action is one for money had and received. Chitty says (Contracts, 11th Am. ed., p. 898): “This action is regarded as being almost as extensive as it was in Lord Mansfield’s time, it being still held, in conformity with the view expressed by him, that where money is due ex cequo et bono it may be recovered in an action for money had and received.” Chitty concedes that the action does not lie for money paid by the plaintiff as payable in point of honor and honesty or in cases where the defendants may retain it with a safe conscience, though by positive law he would have been barred from recovering it, “but it lies for money paid by mis *164 take; or upon a consideration which happens to fail; or for money got through imposition, express or implied.”
So our American author, Wait (Actions and Defenses, Vol. IV, p.469), citing many American authorities, says:
“If the plaintiff’s right to the money is established, and the defendantis shown to have received it under such circumstances that he ought not to retain it, the law implies a promise to pay it to the party who ought to have it. Thus, where money is paid by one upon a judgment that is subsequently reversed, it may be recovered back, the law implying the requisite promise to repay it to the party who paid it. So, where a person has paid money upon a consideration that has failed, or that is void for illegality or other cause, the law implies a promise on the part of the person to whom or to whose use it was paid to refund it.”
The phrase “the law will imply a contract” has been much criticised by eminent authorities of late years, and the counsel for the defendants is well fortified in his contention that the law will never imply contract. Nevertheless, it seems to the court that it is a generally understood phrase, both in courts and legislatures, and that when it is used figuratively it is not an incorrect phrase. When we say “the pot boils,” it is not understood, or to be understood, that the metal of which the pot is composed is in a state of ebullition. So when it is said that the law will imply a contract, it is not to be understood that the law does actually imply a contract, but that on a given state of facts it authorizes a court or jury to infer from them the contract which the defendant ought to have made, and precludes him from evading responsibility (the responsibility of paying for property which he has taken or of refunding money Avhich he has no right to withhold) by setting up his own tor-tious acts or unconscionable intent as a defense. The law holds him to a promise or contract where he ought to have promised or contracted, and forbids him to say that he did not.
In the present case the facts come within the authorities. An agent of the defendants did what he was unauthorized to do. He allowed the claimant to make an entry upon the public lands which were in fact withheld from entry, and he received from the claimant as a part of the price of these lands in money, 50 cents per acre, amounting to $118. This money he paid over to the defendants and it is now in their treasury. The claimant subsequently abandoned the land and restored *165 ■possession to the defendants. The case is that stated by Waite: “Where a person had paid money upon a consideration which has failed, or that is void for illegality or other cause, the law implies a promise on the part of the person to whom it was paid to refund it.” If the entry was illegal, if the officers of the United States were without authority to permit the entry, if the law was such that they would not be able eventually to give a valid title to the land, the claimant on surrender of possession was entitled to receive back the money which he had paid as an installment upon the purchase money and which the United States still have in their possession.
So the case stands, or must be assumed to stand. The defendants have both the land and the money; the claimant has nothing. The primary error was by the defendants’ agents, who sold land which they had no authority to sell and received money which they ought not to have accepted; and this money, it seems to the court, is due from the defendants to the claimant, ex mquo et bono, and recoverable in this action.
It is not to be understood that an action against the Government for money had and received has never been before this court or that an obligation quasi contract has never reached a judgment. In Sausser’s Case (9 C. Cls. R., 338) a distiller, pursuant to regulations, sought to purchase a meter from the manufacturer and, pursuant to regulations, deposited the prescribed amount with the deputy collector, who did not pay over the money to the manufacturer or to the Treasury, but embezzled it. The distiller brought his action to recover back the amount of the deposit. Here there was no express contract, and the Government had reaped no benefit from the deposit; but the court held that money deposited with the collector in pursuance of Treasury regulations was money advanced to the Government for which it was bound to account.
In the Boston Bank Cases (10 C. Cls. R., 519; 96 U. S., 30) the claimant’s cashier was induced by the fraudulent representations of a 'third party to present gold certificates at the subtreasury for redemption. The Government’s cashier did not receive them from the bank, or recognize them as its property, but credited them to the third party and applied the money toward- making good his own defalcation, in which he, in collusion with the third party, was indebted to the Government. The bank brought its action to recover back the amount *166 of the certificates as money bad and received for its use. There was no express contract, and there was no intent on the part of the Government’s officer to recognize the bank or to receive the money to its use or to refund to it the avails of the certificates. Yet the Supreme Court, recognizing the general principle that “an action will lie whenever the defendant has received money which is the property of the plaintiff, and which the defendant is obliged by natural justice and equity to refund,” applied it to the case before the court and said: “Here the basis of the liability insisted upon is an implied contract by which they, the United States, might well become bound by virtue of their corporate character.” The court added: “Surely it ought to require neither argument nor authority to support the proposition that, where the money or property of an innocent person has gone into the coffers of the nation by means of a fraud to which its agent was a party, such money or property can not be held by the United States against the claim of the wronged and injured party.”
In Johnston’s Case (17 C. Cls. R., 157), where the treasurer withheld moneys deposited with him by the receiver of an insolvent bank and applied them upon a tax which was held to be illegal, the court said: “The defendants have money belonging to the claimant which they can not in equity and good conscience retain, and this action, in the nature of assumpsit for money had and received to the claimant’s use, may be maintained.”
In Thayer’s Case (20 C. Cls. R., 137) agents of the land office seized and sold certain saw logs belonging to the claimant and paid the proceeds into the Treasury. It was held that though the Government be not responsible for the trespass of its officers who illegally seized the property of a citizen, yet if the proceeds pass into the Treasury the Government will be liable on implied contract. The court says, “The Government having received the money into its custody without any just or legal right thereto, the law, in our opinion, implies a contract to account to the owner for it, which can be enforced in this court.”
All of these cases were decided before the codification of the law in the Tucker Act. Some of them are not strictly cases of quasi contract, yet some of them are; and the language of both courts in all cases clearly indicates that the term “implied *167 contract,” as used in tbe jurisdictional statute, was, in tbe opinion of tbe courts, a term intended to embrace all actions ex contractu.
There are undoubtedly cases where it is necessary to discriminate between involuntary obligations and voluntary agreements. Thus in tbe case of tbe New York Central R. R. (24 C. Cls. R., 22) this court said in one breath (of tbe cause of action): “This is an action brought upon a judgment, and (of tbe claimant’s right to recover interest) we fully agree with the New York Court of Appeals in O’Brien v. Young (95 N. Y. R., 428), that while a judgment may be treated as a contract for certain purposes it is not a contract in the sense of a voluntary agreement.” Iu ascertaining the rights and obligations of the parties, it may be necessary to inquire into the legal nature and character of the cause of action and to discriminate between contracts which are express or implied and obligations which are enforceable quasi contracts; but, in this court at least, these discriminations go to the liability and not to the jurisdiction.
As regards the scope and nature of the obligations which may be enforced quasi contracts, the counsel for the defendants has carefully, and, in the opinion of the court, accurately reduced them to three classes.
The first are those in which the action is founded “upon a record, a judgment, for example.” But in Brown’s Case (6 0. Gis. B.) the claimants brought their action upon a decree of this court against the United States and rested their case “upon the jurisdictional ground that a judgment is a contract” within the intent of the jurisdictional act. The court was divided upon the point, one of the judges holding (p. 203) that the court can not “take jurisdiction of an action upon a judgment.” A majority of the court, after au unusually careful examination of the subject, held that the court had jurisdiction and that the action would lie. The Treasury acquiesced in the result and paid the judgment. But in the case of O’Grady (22 Wall., 641) the question was again raised and carried to the Supreme Court, which recognized and upheld the jurisdiction of this court. Here, then, was a case of quasi contract held to be an “implied contract” within the intent of the statute.
*168 It may also be noted that in the New York Central Railroad?s Case (24 0. 01s. E., 22) the action was brought upon a judgment which had been recovered by the claimant against an internal-revenue collector. In this court the judgment recovered thereon against the United States was for a very large amount, $107,978.28, yet the Attorney-General rested content therewith and did not carry the case to the Supreme Court.
The second class of cases are those in which the action is founded upon “a statutory or customary or official duty.” These Congress seemed to have anticipated to some extent by the jurisdictional provision that an action may be maintained upon “all claims founded upon any law of Congress or upon any regulation of an Executive Department.” Still there are cases where the courts have deemed the action to be likewise well founded upon an implied contract. In Campbell’s Case (107 U. S., 407) the claimants sought a drawback upon exported goods. The collector refused to accept the entry or take any steps in the matter. The claimants brought their action. This court held that it was without jurisdiction, because the parties’ right to the drawback was dependent upon the action of the proper executive officers empowered by law to examine and decide upon such claims. But the Supreme Court, through one of its ablest members, said: “We think the Court of Claims has jurisdiction of such a claim; (1) because it is founded upon a law of Congress, and (2) because the facts found in this case raise an implied contract that the United States will refund to the importer the amount he paid to the Government.”
The third class of cases are those in which an action is founded upon the doctrine that no one shall be allowed to enrich himself unjustly at the expense of another. But in the case of Marshall O. Roberts et al. (11 C. Cls. R., 98, and 92 U. S. 41) the services were voluntary; no contract had existed, and, indeed, it had been expressly stipulated that none should arise out of the acceptance of the service by the Postmaster-General. Congress referred the claim by an act which simply directed the court “to examine the same and determine and adjudge whether any, and if any, what amount is due- said trustees for said extra service.” The first point made by the Solicitor-General for the Government in the Supreme Court was, “Under the state of things existing before the passage of the act the claimants had no rights *169 wbicb could be enforced in a court of justice;” and the second was,- “The act refers to the Court of Claims only such rights as the claimants had previous to its passage.” Three of the judges of the Supreme Court dissented from the judgment in the case upon the ground that “ it makes a contract where the parties made none.” But the decision of a majority of the court was that “ where a necessary public service has been performed at the request of the proper Government agents and under the expectation of compensation and with reliance upon Congress to fix the amount, and where Congress, upon application made to it, have referred the matter to the Court of Claims, we think that that court is authorized to make and adjudge such an allowance as is required ex sequo et bono by all the circumstances of the case.”
Undoubtedly there are obligations, moral and equitable, which are beyond the recognition of jurisprudence and can not be enforced at law or in equity. These are obligations which rest upon the conscience or honor of the individual. So there are “hard bargains” upon which plaintiffs constantly recover; and yet there are unconscionable contracts which courts refuse to enforce. (Hume’s Case, 132 U. S. 406.) From an ethical point of view it is not always easy to draw the line of demarkation. But in the law, as pointed out by Ohitty (supra), the distinction between cases in which the obligation would be enforced as if it were a contract and cases in which the obligation is one only of honor or conscience is well defined and understood. In suits against the Government the analogies gathered from the law regulating the obligations of individuals have always been followed. Many actions have been brought here where the parties have supposed that the court would administer abstract justice, but the court has always restricted its judgments to cases where an individual could have recovered against an individual. In some instances Congress has given relief where the courts, in the strict administration of the law, have been unable to do so (McCord or Chouteau’s Case, 95 U. S., 61; McKay’s Case, 422 C. Cls. R., 422); but the courts have never held the Government to a liability which would not have been imposed upon a citizen.
With these questions of liability decided positively and negatively — against the Government and for the Government— *170 tbrougli a courseof manyy ears, it seems to the court that the primary subjectofjurisdictionmust nowberegarded as well settled. There have been a few cases in the Supreme Court where the decision was against jurisdiction — cases requiring equitable remedies, or cases wherein- the existence of a contract was neg-ativeu by peculiar facts- and circumstances — and there have been many more cases where the decision was against liability on the part of the Government; but there has never been a case in form ex contractu in which the liability of the Government has been maintained and the jurisdiction of the court denied.
The order of the court is that the demurrer to the petition be overruled, with leave to the defendants to plead within one month.