## MISSOURI UTILITIES CO. v. CITY OF CALIFORNIA, MO., et al.
### No. 622.

District Court, W. D. Missouri, Central Division.

Nov. 2, 1934.

456

Fordyce, White, Mayne & Williams, of St. Louis, Mo., for plaintiff.

L. P. Embry, of California, Mo., for defendants city of California and city officials.

Henry T. Hunt, of Washington, D. C., for defendant Harold L. Ickes, as Federal Emergency Administrator of Public Works.

Bowersock, Fizzell & Rhodes, of Kansas City, Mo., for defendant Fairbanks-Morse Const. Co.

A. Z. Patterson, D. C. Chastain, Cyrus Crane, Blatchford Downing, and Samuel W. Liske, all of Kansas City, Mo., amici curiæ.

OTIS, District Judge.

The matters under submission are motions of defendants to dismiss plaintiff's bill.

The facts alleged in and the theory of the bill are as follows:

The city of California is a Missouri municipal corporation. Its population in 1930 was 2,384. On October 30, 1933, an election was held in California to determine whether bonds in a total amount of $100,000 should be issued, the proceeds of which would be used for the construction of an electric lighting plant to be owned exclusively by the city. At the election, the proposal to issue bonds carried by the required majority. Thereafter the bonds were issued and were sold to the United States for $100,000. In addition to the purchase price paid to the city, the United States made a grant to the city of $35,000 to be used in the construction of the proposed electric lighting plant. The city then entered into a contract with Fairbanks-Morse Construction Company for the erection of the plant. Work had been begun and some progress made when the plaintiff filed its bill in this case.

The plaintiff, a Missouri corporation, is engaged in the business of manufacturing and selling electric power. It has an electric plant in California, and sells electric power there and in the surrounding territory. It is subject to regulation by, and has been regulated by, the Public Service Commission of Missouri, and, with the approval of the commission, has issued and sold securities. It has no franchise, exclusive or otherwise, from California, but it alleges that it has lawful and valid operating rights (being a certificate of convenience and necessity from the Public Service Commission) for the conducting of its electrical business in that city.

The plaintiff will be greatly damaged, so it is alleged, if the city of California is permitted to have constructed and to operate such an electric lighting plant as is proposed and as is now in process of construction.

It will be damaged because it necessarily will lose some, and may lose all, of its business in that city. It may be damaged further in its business outside of California.

The prayer of the bill is that the city of California, its officers, and the Fairbanks-Morse Construction Company, all defendants, be enjoined from constructing the proposed electric lighting plant with any money paid for its bonds by the United States or granted to it by the United States.

The theory of the bill is that the United States has no power under the Constitution to buy bonds or to grant money for the purpose of enabling a municipality to construct a municipal lighting plant, and that the direct result of its so doing in this case will be to deprive plaintiff of its property without due process of law in violation of the Fifth and Fourteenth Amendments and to subject it to illegal competition.

In addition to the defendants originally named in the bill, Harold L. Ickes, Secretary of the Interior, as Federal Emergency Administrator of Public Works, upon his application, has been made a party defendant. He has filed a motion to dismiss the bill. The other defendants have filed a similar motion. The motions in substance and language are identical. They challenge the bill on the grounds: (1) That no federal question is involved; (2) that the facts alleged do not entitle the plaintiff to equitable relief; and (3) that the bill shows on its face such laches in the plaintiff as to defeat its right, if otherwise existing, to any equitable relief.

The contention of laches may be dismissed at once. Whatever may be the real facts, laches cannot be predicated upon the facts alleged. With this contention dismissed from further consideration, I conceive that the real questions here are these: (1) In purchasing the bonds issued by the city of California and in making a grant of money to that city, did the Administrator of Public Works act within the authority purported to be conferred upon him by any act of Congress? (2) If any act of Congress conferred on the Administrator the authority exercised by him, was that act within the constitutional power of Congress? (3) If the second of these questions is answered in the negative, is the plaintiff so directly affected that it may raise the question of constitutionality in this court? (4) Is the plaintiff entitled to equitable relief upon any theory?

458

### The Administrator Acted Within the Scope of His Authority.

█ 1. On July 16, 1933, the President approved the National Industrial Recovery Act. 48 Stat. 195. In title 2 of that act (40 USCA § 401 et seq.), the President was authorized to create a Federal Emergency Administrator of Public Works. Section 201 (a), 40 USCA § 401 (a). It is the duty of the Administrator, under the direction of the President, to prepare a comprehensive program of public works. Section 202, 40 USCA § 402. The President is authorized, through the Administrator, to finance, or aid in the financing of and to make grants for, the construction of any public works project included in the program referred to in section 202, among which is the construction of "publicly owned instrumentalities and facilities." Section 203 (a), 40 USCA § 403 (a). An appropriation of $3,300,000,000 is made for the purposes of the act. Section 220, 40 USCA § 411.

Such is a brief outline of the pertinent provisions of title 2. To indicate that what the Administrator did in connection with the financing of the construction of the proposed municipal lighting plant in the city of California was within the terms and provisions of the act, it is enough to show that that is a public works project within the meaning of the act. That it is such a project scarcely is controvertible. Certainly, when constructed, it will be a "publicly owned instrumentality and facility."

### Power of Congress.

2. What the Administrator did Congress authorized him to do, but did Congress have the power so to authorize him? That question now will be considered.

The question should be stated as exactly as may be. Endeavoring to do that, we have: In such a national emergency as the present period of economic depression has been and is, one of the aspects of which emergency is the unemployment of millions of men and women, and on that account privation and suffering among them and a consequent grave danger of widespread unrest, in such a national emergency does the Congress have the power to appropriate money from the Treasury of the United States, for the purpose of relieving unemployment, to be used in financing the construction of such public works as electric lighting plants in and by municipalities? Is that power to be found in any of the provisions of the supreme law of the land, the Federal Constitution, which rules alike the President, the Congress, and the courts?

Those who have studied the history of this nation know that the Constitution came into being in a period filled with dangers threatening the destruction of the republic. The gravity of the situation caused by those then threatening dangers greatly was magnified by the pitiful weakness of the federal government under the Articles of Confederation. To prevent the evils which certainly soon would have ensued, it was necessary that a strong and powerful national government be provided, a government capable of dealing effectively with dangers which had threatened, were then threatening, and might thereafter threaten, the United States as a sovereign and independent nation. Provision for such a government is of the very essence of that Constitution which was established and ordained to form a more perfect union, to establish justice, to insure domestic tranquility, to provide for the common defense, to promote the general welfare, and to secure to the American people the blessings of liberty. The people of the United States in their Constitution gave power to their government that in their interest it could preserve the nation against whatever might endanger its continued existence, and they denied it any power to take away from the individual citizen any of his inalienable rights. Those who have studied the history of this nation know these facts.

Those who have studied the history of the world as well as those who are familiar only with contemporaneous events throughout the world know that the existence of a nation may be imperiled by foreign aggression not only, by civil war not only, it may be imperiled, it may be destroyed utterly, by the unreasoning rage of masses, a rage aroused by hunger, by want in every form, by a sense of injustice, a rage stirred up alike by sincere and honest, as well as by villainous, leaders. It is a rage which does not analyze, which does not discriminate. It is not content with driving the money changers from the temple; it destroys the temple itself.

█ Every one should know that in general economic distress is possibility of grave danger to the established order. The political branches of government, that is, the executive and legislative branches, must guard and protect the national existence, if it is to be done at all, and that they can do only through the enactment and enforcement of laws. It is for them to decide whether a situation has arisen which endangers the existence or gen-

eral welfare of the nation; it is for them to decide what measures shall be taken to avert dangers arising from that situation. With these decisions or their wisdom courts and judges have nothing to do save only in that case in which it has most clearly been demonstrated that the political branches of government not only have usurped powers not granted them by the Constitution, but in so doing directly have injured a litigant who has come to the courts for relief. The inquiry here then will not concern the expediency or the wisdom of any act of Congress, but only the power of Congress.

Those who reverence the Constitution, who venerate its framers, who view attacks upon it with deep concern, certainly with difficulty will be convinced that there can be a great danger threatening the general welfare and possible existence of the nation which the national government is powerless under the Constitution to obviate and counteract. They have been taught to believe of the Constitution that what the great Chief Justice said of it in Cohens v. Virginia, 6 Wheat. 264, 387, 414, 5 L. Ed. 257, is true, that it is "a constitution * * * framed for ages to come, * * * designed to approach immortality, as nearly as human institutions can approach it, (that) its course cannot always be tranquil, (that) it is exposed to storms and tempests, and (that) its framers must be unwise statesmen indeed, if they have not provided it, so far as its nature will permit, with the means of self-preservation from the perils it may be destined to encounter."

But faith in the Constitution is no sufficient basis for the exercise of power by any branch of the national government. He who asserts a power where in an actual case or controversy it is challenged must be able to put his finger on that provision or those provisions of the Constitution which grant it or from which it will be implied.

To the challenge which the plaintiff makes, that there is no constitutional basis for the power sought to be exercised by the Congress in the enactment of title 2 of the National Industrial Recovery Act (40 USCA § 401 et seq.), the defendants make answer that that power expressly is granted in the first clause of section 8 of article 1 of the Constitution, which is: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." [1]

We consider then this provision of the Constitution. And, first, to discover, if we can, from the very language of the provision, what power it confers on Congress.[2] Scarcely will it be possible to do that with any originality, since our minds are filled with the views of commentators long since studied and absorbed.

Those who opposed the adoption of the Constitution suggested that this provision empowered the Congress to enact any laws it might conceive were for the general welfare of the United States, but it is patent from its language that it does nothing of the kind, and at this day none can be found who will so contend. At once discarding, therefore, any such impossible construction, there are two interpretations only which have been authoritatively suggested. One of these early was given by Alexander Hamilton, who in his Report of Manufactures said of the "general welfare" phrase:

"The phrase is as comprehensive as any that could have been used because it was not fit that the constitutional authority of the Union to appropriate its revenues should have been restricted within narrower limits than the 'general welfare,' and because this necessarily embraces a vast variety of particulars which are susceptible neither of specification nor of definition. It is therefore of necessity left to the discretion of the National Legislature to pronounce upon the objects which concern the general welfare, and for which, under that description, an ap-

---

[1] In this case the defendants do not rely on the commerce clause (clause 3, § 8, article 1), but solely on the general welfare clause. In Missouri Public Service Co. v. City of Concordia et al., decided by this court September 19, 1934, reported in 8 F. Supp. 1, in which some of the questions are identical with those here, the defendants sought to justify title 2 of the National Recovery Act by the commerce clause. In the opinion of Reeves, J., it is clearly shown that that clause could not and does not support the power

undertaken to be exercised by the Congress. I concur fully with all Judge Reeves said upon that subject.

[2] That one of the objects of the people in ordaining and establishing the Constitution was "to promote the general welfare" is set out in the preamble. The reference in the preamble to this object does not vest any power in the national government. Jacobson v. Massachusetts, 197 U. S. 11, 22, 25 S. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765.

propriation of money is requisite and proper. And there seems to be no room for a doubt that whatever concerns the general interests of learning, of agriculture, of manufactures, and of commerce, are within the sphere of the national councils, as far as regards an application of money.

"The only qualification of the generality of the phrase in question which seems to be admissible is this: That the object to which an appropriation of money is to be made must be general, and not local; its operation extending in fact or by possibility, throughout the Union, and not being confined to a particular spot."

Under Hamilton's interpretation, the Congress may not indeed legislate generally as to any matter which concerns the general welfare, but it may appropriate money for any purpose which concerns the general welfare. The clear distinction between these concepts may be illustrated easily. Thus, the suppression of all crime certainly is for the general welfare of the United States, but the Congress has no power to so legislate as to make kidnapping, for example, a crime against the United States, absent some intrusion of the criminal act into a field of legislation specially delegated to Congress. The Congress can, however, appropriate money to aid state authorities in bringing kidnappers to justice and in suppressing the crime of kidnapping.

The second of the two interpretations is that the "general welfare" phrase in clause 1 of section 8 of article 1 does not at all enlarge the powers of Congress beyond the powers expressly conferred on Congress in the remaining clauses of section 8. Under that interpretation, Congress can appropriate money for the general welfare only in so far as the appropriation may be incidental to its other expressly delegated powers, as its power to regulate commerce and as its power to establish post offices and post roads. Mr. Madison was the father and, in our early legislative history, the chief exponent in Congress of this narrower interpretation. In No. 41 of the Federalist, speaking of the "general welfare" phrase in clause 1 and of the contention that it vested power in Congress, he said:

"Had no other enumeration or definition of the powers of Congress been found in the Constitution than the general expressions just cited (the reference is to subdivision 1), the authors of the objection (that the provision conferred power generally to leg-

islate for the general welfare) might have had some color for it. * * *

"But what color can the objection have, when a specification of the objects alluded to by these general terms, immediately follows; and is not even separated by a longer pause than a semicolon? If the different parts of the same instrument ought to be so expounded as to give meaning to every part which will bear it; shall one part of the same sentence be excluded altogether from a share in the meaning; and shall the more doubtful and indefinite terms be retained in their full extent, and the clear and precise expressions be denied any significance whatsoever? For what purpose could the enumeration of particular powers be inserted, if these and all others were meant to be included in the preceding general power."

Who was right, Hamilton in his broad construction or Madison in his more narrow one?

The conclusion that in this instance Hamilton was right seems to my mind inescapable. It is not to be conceived that the framers of the Constitution inserted in that most carefully written instrument words and phrases which were intended to have no meaning. Ogden v. Saunders, 12 Wheat. 213, 315, 6 L. Ed. 606; Myers v. United States, 272 U. S. 52, 151, 47 S. Ct. 21, 71 L. Ed. 160. When Congress was given power "to lay and collect Taxes, Duties, Imposts and Excises" (and hence by necessary implication to appropriate the money so collected [3]) "to pay the Debts and provide for the common Defence and general Welfare of the United States," it was given that power plainly, and it has that power fully unless in some other place in the Constitution that power is limited.

Madison's argument that, where general words or phrases are followed by special words or phrases, the former are limited by the latter, is without force. The several clauses in section 8 are not one grant of power, but eighteen separate and distinct grants, each complete within itself. Each subdivision deals with a different subject matter. If in any one of them general words are followed by specific words, the rule would be in point, but it is just as illogical to say that subdivision 1 is limited by each of the succeeding seventeen subdivisions as it would be to say that clause 3 ("The Congress shall have Power * * * To regulate Commerce with foreign Nations, and among the

_____
[3] United States v. Realty Co., 163 U. S. 427, 440, 16 S. Ct. 1120, 41 L. Ed. 215.

several States, and with the Indian Tribes") is limited by clause 9 ("The Congress shall have Power * * * To constitute Tribunals inferior to the supreme Court").

Madison was right, of course, in saying that, if clause 1 gave to the Congress all power to legislate for the general welfare, then the rest of section 8, delegating specific powers, is useless surplusage, but clause 1 gives to the Congress only a limited power, to wit, to appropriate money for the general welfare. So limited, delegation of other powers was both necessary and purposeful.

Joseph Story, the greatest of the commentators on the Constitution, put the case for the broad construction succinctly when he said (Story's Commentaries [5th Ed.] p. 675): "The only real question is, whether, even admitting the power to lay taxes is appropriate for some of the purposes of other enumerated powers (for no one will contend that it will, of itself, reach or provide for them all) it is limited to such appropriations as grow out of the exercise of those powers. In other words, whether it is an incident to the powers, or a substantial power in other cases, which may concern the common defense and the general welfare. If there are no other cases which concern the common defense and general welfare, except those within the scope of the other enumerated powers, the discussion is merely nominal and frivolous. If there are such cases, who is at liberty to say that, being for the common defense and general welfare, the Constitution did not intend to embrace them? The preamble of the Constitution declares one of the objects to be, to provide for the common defense and to promote the general welfare; and if the power to lay taxes is in express terms given to provide for the common defense and general welfare, what ground can there be to construe the power short of the object—to say that it shall be merely auxiliary to other enumerated powers, and not co-extensive with its own terms and its avowed objects? One of the best established rules of interpretation, one which common sense and reason forbids us to overlook, is, what when the object of a power is clearly defined by its terms, or avowed in the context, it ought to be so construed as to obtain the object, and not to defeat it."

Certainly one of the great constitutional scholars and lawyers of the present generation is James M. Beck, lately Solicitor General of the United States. His view of the general welfare clause coincides with that of Hamilton and Story. In his argument in Massachusetts v. Mellon, 262 U. S. 447, see loc. cit. 456, 43 S. Ct. 597, 67 L. Ed. 1078, he said: "Moreover, the grant of power to tax and appropriate, in the first clause of section 8, is distinct from the grants of power in each of the other sixteen clauses of that section, and there is nothing in the sweeping term 'to provide for * * * the general welfare' to show that the power to appropriate money was given merely in aid of the grants in those other clauses."

■ Executive and legislative construction of constitutional provisions always has been and should be given great consideration by the courts. Stuart v. Laird, 1 Cranch, 299, 308, 2 L. Ed. 115; Downes v. Bidwell, 182 U. S. 244, 286, 21 S. Ct. 770, 45 L. Ed. 1088; United States v. Midwest Oil Co., 236 U. S. 459, 472, 35 S. Ct. 309, 59 L. Ed. 673; Field v. Clark, 143 U. S. 649, 683, 12 S. Ct. 495, 36 L. Ed. 294. Many instances of presidential and congressional acts are to be found in our history which can be justified as lawful exercises of power only under the broad construction of the general welfare phrase. Consider, as examples, the numerous acts of Congress for the promotion of education, particularly in the science of agriculture, and the vast appropriations voted in that connection.[4] In what of the powers delegated to Congress, except in clause 1 of section 8 of article 1, can there really be found any support for such legislation or such appropriations? Were all these acts and appropriations usurpations of power?

The executive and legislative branches of the government almost continuously since and including the administration of the first President have acted upon the theory that Congress can appropriate money for the promo-

[4] Almost ludicrous attempts have been made, by those who are unwilling to concede that the "general welfare" phrase is a source of power, to relate such appropriations to some other of the delegated powers. Thus it has been suggested that appropriations for education in agriculture are authorized by the powers of Congress to declare war and to raise armies. Educated farmers will raise more crops than those uneducated. More crops will better enable the nation to wage war, if there is a war. Therefore educating farmers really is a war measure. How far-fetched this is! A crimeless nation also is better fitted for war. Why then should not Congress legislate in the whole field of crime? Or in the field of eugenics, so that we shall have more virile soldiers for our future wars?

tion of the general welfare without limitation to other delegated powers.[5]

Unfortunately the opinions and decisions of the Supreme Court have not finally and clearly resolved the controversy between those contending for the differing interpretations of the general welfare phrase. In United States v. Gettysburg Electric Railway Co., 160 U. S. 668, 16 S. Ct. 427, 429, 40 L. Ed. 576, there is reference to this phrase as a source of power. The question there was whether the national government had the power to condemn the land on which the Battle of Gettysburg was fought. The court said that power resulted from other powers expressly given, including "the great power of taxation, to be exercised for the common defense and general welfare," and that the use to which the condemned land was to be put (among others the inculcation of a spirit of patriotism essential to the maintenance of the nation) was one so closely connected with the welfare of the republic itself as to be within the powers granted Congress by the Constitution for the purpose of protecting and preserving the whole country. It must be said that this is at least strong dictum supporting the doctrine that the welfare phrase is an independent source of power.

The most pertinent decision of the Supreme Court is United States v. Realty Company, 163 U. S. 427, 16 S. Ct. 1120, 1125, 41 L. Ed. 215. In principle that decision supports the broad construction.

The Congress had passed an appropriation act (March 2, 1895, c. 189, 28 Stat. 910, 933) appropriating money to pay a bounty of two cents a pound to producers and manufacturers of sugar if the sugar produced or manufactured should meet a certain quality test. The sole power relied on for this appropriation was the general welfare provision. In the earlier case of Field v. Clark, 143 U. S. 649, 695, 12 S. Ct. 495, 36 L. Ed. 294, the Supreme Court had declined to pass on the question whether that provision did empower Congress to grant such a bounty. The same question came to the court again

in United States v. Realty Company. But the more immediate question was whether the United States, having promised to pay a bounty, even without power so to do, thereby had created a debt which Congress had power to discharge by an appropriation.

Once more the court declined to interpret the general welfare provision, saying: "It is unnecessary to hold here that congress has power to appropriate the public money in the treasury to any purpose whatever which it may choose to say is in payment of a debt or for purposes of the general welfare. A decision of that question may be postponed until it arises."

But the court did decide that Congress had the power, derived from clause 1 of section 8 of article 1, to appropriate money to pay a debt arising only from the moral obligation of the nation, "although the debt could obtain no recognition in a court of law." The court said: "Under the provisions of the constitution (article 1, § 8), congress has power to lay and collect taxes, etc., 'to pay the debts' of the United States. Having power to raise money for that purpose, it of course follows that it has power, when the money is raised, to appropriate it to the same object."

Now it is clear that the only constitutional power to pay such a debt as the promise to give a bounty to sugar producers and manufacturers is in clause 1 of section 8, and the court said that there was the source of the power. It cannot possibly be attached to any other power vesting provision. But clause 1 includes three purposes for which taxes, etc., may be collected, "to pay the Debts and provide for the common Defence and general Welfare of the United States." By what sort of reasoning can it be argued that the same language which authorizes Congress to appropriate money to pay a debt not incurred in the discharge of any power elsewhere vested in Congress does not also authorize Congress to appropriate money to achieve some object essential to the general welfare not within the scope of any power elsewhere vested in Congress.[6]

5 In the Harvard Law Review of March, 1923, at page 548, is an article entitled "The Spending Power of Congress" by Edward S. Corwin. In this article references with citations are made to numerous acts of Congress and executive communications, all of which indicate a continuous administrative and legislative construction of the general welfare clause in accordance with the Hamiltonian interpretation. See, also, citations in brief of counsel in Massachusetts v. Mellon, 262 U. S. at page 447, 43 S. Ct. 597, 67 L. Ed. 1078.

6 Some discussion of the general welfare provision is to be found in opinions of the inferior federal courts. It was discussed in United States v. Boyer, 85 F. 425, decided by this court, speaking through Judge Rogers, February 28, 1898. The question involved was whether Congress had power to authorize federal.

My conclusion is that the Congress has the power to appropriate money for the promotion of the general welfare and that it is not restricted in so doing to objects germane to its other delegated powers. Congress therefore has the power to appropriate money for the relief of any condition of unemployment which is not merely local but is national in its extent and hence inimical to the general welfare. I have reached this conclusion from a consideration of the text of the Constitution, of the views of the commentators, of legislative and executive construction of the Constitution, and of the decisions of the Supreme Court. A conclusion so well buttressed scarcely needs to be, but further is, fortified by the firmly established rule that any mere doubt as to the validity of an act of Congress must be resolved in favor of its validity. Railway Express Agency v. Virginia, 282 U. S. 440, 51 S. Ct. 201, 75 L. Ed. 450, 72 A. L. R. 102; O'Gorman & Young, Inc., v. Hartford Fire Ins. Co., 282 U. S. 251, 51 S. Ct. 130, 75 L. Ed. 324, 72 A. L. R. 1163; Legal Tender Cases, 12 Wall. 457, 531, 20 L. Ed. 287.

It may be added that it is not necessary to rely wholly upon the general welfare provision in the first clause of section 8 of article 1. The last clause of section 8 provides that: "The Congress shall have Power * * * To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." (Clause 18).

No less an authority than the Supreme Court of the United States has said that this clause of section 8 gives to Congress whatever power may be necessary to preserve the existence of the nation and the Constitution. In the Legal Tender Cases, 12 Wall. 457, 532, 20 L. Ed. 287, the court, speaking of the powers of Congress, said:

"No single power is the ultimate end for which the Constitution was adopted. It may, in a very proper sense, be treated as a means for the accomplishment of a subordinate object, but that object is itself a means designed for an ulterior purpose. Thus the power to levy and collect taxes, to coin money and regulate its value, to raise and support armies, or to provide for and maintain a navy, are instruments for the paramount object, which was to establish a government, sovereign within its sphere, with capability of self-preservation, thereby forming a union more perfect than that which existed under the old Confederacy.

"The same may be asserted also of all the non-enumerated powers included in the authority expressly given 'to make all laws which shall be necessary and proper for carrying into execution the specified powers vested in Congress, and all other powers vested by the Constitution in the government of the United States, or in any department or officer thereof.' It is impossible to know what those non-enumerated powers are, and what is their nature and extent, without considering the purposes they were intended to subserve. Those purposes, it must be noted, reach beyond the mere execution of all powers definitely intrusted to Congress and mentioned in detail. They embrace the execution of all other powers vested by the Constitution in the government of the United States, or in any department or officer there-

agents to inspect meats in packing plants. Counsel for the United States pointed both to the commerce clause and the general welfare clause as authorizing such legislation. The court ruled that the general welfare clause contained no grant of power, but was only a limitation on the taxing power, and based that conclusion on Story's commentary. The further observation of Mr. Justice Story as set out in this opinion was entirely overlooked. Moreover, the case was not one concerning an appropriation in aid of the general welfare but concerning general legislation. Certainly such legislation cannot be bottomed on the general welfare provision. In Amazon Petroleum Corporation v. Commission, 5 F. Supp. 639, decided by the District Court for the Eastern District of Texas February 12, 1934, the validity of title 1 of the National Industrial Recovery Act [15 USCA § 701 et seq.] was in question. The only reference in the opinion to the general welfare provision is in a quotation from a brief of the present Chief Justice when at the bar in which Mr. Hughes (now Mr. Chief Justice Hughes) cited Story to the effect that the general welfare clause is not a general grant of power to legislate for the general welfare. There is no more than that in Hart Coal Corporation v. Sparks (D. C.) 7 F. Supp. 16. In each of these three cases the court goes back to Story, but misses entirely the conclusion of Story that, while Congress cannot legislate generally for the general welfare, it can appropriate money to promote the general welfare.

464

of. It certainly was intended to confer upon the government the power of self-preservation."

### General Versus Local Welfare.

■ It is urged, however, by plaintiff's learned counsel and by others who have filed briefs amici curiæ, that, even if all that has thus far been said herein be granted, still Congress can only appropriate money to provide for the general welfare, it cannot appropriate money to relieve unemployment in the little city of California. That, say counsel, is purely a local situation. But the act of Congress under review declares the fact to be that a widespread and national condition of unemployment exists. That that is true is a notorious fact. Obviously there is no other way to relieve unemployment than to relieve it in the localities where it exists. When the localities involved are all the localities in the nation, then the matter of relief certainly is not local but general. The act shows on its face that it is intended to provide, so far as possible, for general relief through aid given, not to one local project or to local projects in one territory of limited extent, but to projects throughout the land. In no true sense is an appropriation for the carrying out of such a program a provision only for local, as distinguished from the general, welfare.

### Public Versus Private Purposes.

■ Further, it is urged that, although Congress may appropriate money from the public treasury for the general welfare, it must be used for public, as distinguished from private, purposes. And it is said that a municipal light plant in California, from the national viewpoint, is a private business enterprise. The simple but complete answer to this contention is that, whatever limitations state Constitutions impose on state governments touching expenditures of public funds, there is no such limitation on the constitutional power of Congress to appropriate money as that it must be appropriated only for public purposes in the narrow sense. Billions of dollars have been appropriated for pensions, every dollar of which was for the private benefit of some individual and every dollar of which was a pure gratuity. Billions of dollars are being expended now to relieve the millions throughout the land who otherwise would be unsheltered, hungry, and unclad. Every dollar of these last-mentioned expenditures is a pure gratuity bestowed on some private person by the government. Are these appropriations challenged? They cannot be. They may have been unwise, but they were made to provide for the general welfare. The object to be attained was within the power of Congress. The selection of means, so long as the means selected has any relation to the object, is exclusively within the discretion of Congress.

■ There is another sufficient answer to this contention. A municipal light plant may be, indeed it is from one viewpoint, a private enterprise. It does not follow that expending money for labor towards its construction, and so relieving unemployment, is expending money for private purposes. If relieving unemployment is a public purpose, how it is relieved does not change its character in that regard.

### No Invasion of Reserved Powers.

■ Finally it is contended that, even although it be granted that Congress may appropriate money to provide for the general welfare, and that even although it be granted that relieving unemployment through aiding in the construction of municipal light plants is a public purpose, still title 2 of the National Industrial Recovery Act is unconstitutional, in that it not only appropriates money in the interest of the general welfare and for public purposes, but it also prescribes conditions as to hours of labor and as to who shall be employed in connection with public projects aided by the appropriation. It is contended that this feature of title 2 is an unconstitutional invasion of the reserved powers of the states. Reliance is put on two celebrated decisions of the Supreme Court. Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, and Bailey v. Drexel Furniture Company, 259 U. S. 20, 42 S. Ct. 449, 66 L. Ed. 817, 21 A. L. R. 1432. It does not seem to me, however, that those cases are at all in point or that there is any validity in this contention.

The cases cited are authorities for the principle that Congress cannot, under the guise of using one of its delegated powers, make rules operative within a state as to matters that really have no relation to the power purporting to be exercised. Hammer v. Dagenhart ruled that Congress could not under the commerce clause prohibit child labor within the states, and that for the reason that no direct relation existed between commerce among the states and the regulation of child labor within the states. Bailey v. Drexel Furniture Company ruled that

Congress could not, under the guise of exercising its power of taxation, regulate child labor within the states. The regulation sought to be made had no real relation to the power purporting to be exercised. There is nothing of that kind in the regulations with respect to labor in title 2. If it be granted that Congress has the power to appropriate money to provide for the general welfare by relieving unemployment, it must be granted that regulating the conditions of the employment made possible by the appropriation so as to accomplish effective relief of unemployment is directly related to the power exercised by Congress.

### Summary of Point 2.

I summarize this part of this opinion by saying that what Congress authorized the President and the Administrator to do it had the power to authorize.

If Congress has exercised its power unwisely, if the executive officers of the government have exercised the power conferred on them unwisely, if through lack of wisdom and of foresight they are doing damage to the republic and its people far outweighing the good they are accomplishing, those are unfortunate possibilities in every government. The Constitution of the United States, which is strong enough to provide for any emergency, provides also a sure remedy against the incompetence of men in office. It makes their terms in office relatively short.

### Plaintiff Cannot Raise Constitutional Question.

3. Assuming now arguendo that title 2 of the National Recovery Act is unconstitutional, has the plaintiff any right to assert that fact and to claim relief here on account of it.

It is elementary that no person successfully can raise a question as to the invalidity of a legislative act unless he has been directly injured by that act. Massachusetts v. Mellon, 262 U. S. 447, 488, 43 S. Ct. 597, 67 L. Ed. 1078.

If Congress has no power to appropriate money to be loaned or granted to the city of California for use by that city in the erection of a municipal light plant, in what way does that unauthorized loan or grant directly affect the plaintiff?

Plaintiff's contentions in this connection are these: (1) Plaintiff has a valuable electric plant in California; (2) the competition of a municipal plant will lessen and may destroy the value of plaintiff's property; (3)

while the city of California has the right to vote, issue, and sell bonds and to build and operate a municipal light plant with the proceeds, it has no right to build a municipal plant a part of the cost of which is defrayed with money unlawfully granted by the United States; (4) the unlawful grant by the United States to the city of California injures the plaintiff because it is a taking of plaintiff's property by the United States without due process of law in violation of the Fifth Amendment.

Let us consider these contentions.

Taking as true the facts alleged in the bill, it must be conceded that the plaintiff has a valuable property in the city of California, including the right, but not the exclusive right, to sell electric current in that city. It must be conceded that the value of its property will or may be lessened if a competing plant is erected and operated just as the value of an office building may be lessened if another office building is erected to serve the same public. It must be conceded that the city of California has the right, if it proceeds according to law, to build and operate a municipal light plant, although it will compete with, and may altogether destroy the value of, the plaintiff's plant. Arguendo only, it will be conceded that the United States had no right to make a grant to the city of California to aid it in the erection of its municipal plant.

How can it be said that the United States has taken or will take plaintiff's property by granting money to the city of California for the building of a municipal plant? Clearly it is not the grant which hurts the plaintiff. The plaintiff is injured by the building and operation of the plant, and those are acts of the city of California.

If John D. Rockefeller had given money to California with which to build a plant, would it be said that he had taken plaintiff's property?

If financing the construction of a municipal plant is the taking of the property of a private plant, it is equally so whether the financing is by way of gift or loan. Would any one contend that every purchaser of a municipal bond whose purchase money goes toward the erection of a municipal plant has taken the property of a privately owned competing plant?

If the plaintiff owned a library in the city of California and made a profit by renting books to the public, and if then Andrew Carnegie gave money to the city for the

building of a free library, would Andrew Carnegie have taken plaintiff's property?

Clearly these questions must be answered in the negative. If the plaintiff will be deprived of its property, it will be deprived of its property by the city of California and not by those, including the United States, who by loan or grant or gift or purchase of bonds have financed the city. So there is no support whatever for the contention that by title 2 of the National Industrial Recovery Act (40 USCA § 401 et seq.) plaintiff has been directly injured through a taking of its property in violation of the Fifth Amendment. Plaintiff, therefore, has no standing on that ground to question the validity of that Act.[7]

### The Fourteenth Amendment.

The bill alleges that plaintiff will be deprived of its property, not only in violation of the Fifth Amendment, but also in violation of the Fourteenth Amendment. The basis for this allegation is hardly to be found either in the bill itself or in the written or oral arguments of plaintiff's counsel.

The Fourteenth Amendment provides that "no State shall * * * deprive any person of * * * property, without due process of law." It is a prohibition only against the states. If individuals, whether municipal officials or others, without authority from the state, unlawfully construct and operate an electric plant in the city of California to the injury of plaintiff's property rights, the plaintiff may resort to the proper court of equity for relief against such illegal competition. Frost v. Corporation Commission, 278 U. S. 515, 49 S. Ct. 235, 73 L. Ed. 483; City of Campbell v. Arkansas-Missouri Power Co. (8 C. C. A.) 55 F.(2d) 560. But this right arises from the general principles of equity and not from the provisions of the Fourteenth Amendment.

The city of California as a municipal corporation has such powers only as it has been granted by the state. If it has acted within the powers granted, its act is the act of the state. If so acting it has de-

prived, or threatens to deprive, plaintiff of its property, then the plaintiff can assert its rights under the Fourteenth Amendment. If the officers of the city have exceeded their powers in what they have done, if they have undertaken to exercise powers not granted by the state, then their action is not that of the state, and does not violate the Fourteenth Amendment, however much it may injure plaintiff.

The only contention plaintiff makes is that the officers of the city exceeded their powers under state law, in that they accepted an unauthorized grant from the United States and will use the money so granted in part payment of the construction of the municipal plant. In some future day, plaintiff fears, the United States will demand the return of the money it has granted. The city of California then will be compelled to repay. Really, therefore, the city officials have incurred an indebtedness in a manner unauthorized by the laws of the state. They have unlawfully obligated the city for the return of moneys used in constructing the municipal plant, and therefore they and the city should be restrained from building and operating the plant and so illegally competing with and injuring the plaintiff.

But, if all of this is true, nevertheless it shows no violation of the Fourteenth Amendment. The state has not deprived, and will not deprive, plaintiff of any of its property.

### Equitable Relief on Other Grounds.

4. Passing from federal questions in this case, it cannot be held that the bill states grounds for equitable relief on account of threatened illegal competition within the doctrine of Frost v. Corporation Commission, supra, and City of Campbell v. Arkansas-Missouri Power Company, supra. The sole basis for contention of illegal competition is that the loan and grant to the city of California by the Administrator of Public Works were unlawful, and that therefore the city has unlawfully obligated itself to return at least the money granted. But the loan and grant were not unlawful, and so the basis for this contention is swept away.

---

[7] The opinion of the Court of Appeals for the Sixth Circuit in City of Allegan v. Consumers' Power Co., 71 F.(2d) 477, decided June 6, 1934, may be read in this connection, although I do not regard it as especially helpful. While the facts there and here are in some respects identical, and while it is held there that the utility company was not so directly in-

jured by title 2 of the National Industrial Recovery Act (40 USCA § 401 et seq.) as to be entitled to challenge its validity, only the interest of the company as a taxpayer is discussed. Its interest as a utility company threatened with injury to its property is not referred to in the opinion.

■ Moreover, if we again assume that Congress had no power to authorize the making of a grant to the city of California, still no case for equitable relief is stated in the bill.

The contention is that the grant was made without constitutional right, and therefore that the money granted, and which already has been used for the purposes and upon the conditions of the grant, may be demanded back by another national administration. An Attorney General other than the present incumbent of that office will sue the city of California in this very court for money had and received in the amount of $35,000. He will set up in the petition filed that a grant was made, that the city of California in reliance upon the grant voted bonds in the amount of $100,000, sold those bonds, and with their proceeds and the money granted constructed a municipal light plant, complying in its construction with all the conditions under which the grant was made. He will set up that the grant, although authorized by statute, really was not authorized, because the statute was invalid, and he will close his petition by a prayer for judgment. He will demand repayment by California of $35,000. At the same time he brings suit against the city of California he will file similar suits against a thousand other municipal corporations to which grants were made in aid of projects of one kind or another.

Perhaps it is not enough to say that Don Quixote never waged battle against as unreal a foe as is this ghost of a possibility. The government is as likely to sue the countless thousands to whom it has given outright and direct relief, and it could as well do so, as it is to sue the municipalities aided by its grants. It is enough to say that no such suit could be maintained.

The grant to the city of California was not a gift to the city of California. Conditions, and onerous ones, which the city of California accepted, were annexed to the grant. The grant has been executed. The conditions have been performed. The situation never can be restored to the status quo. How then and under what rule of law can the United States recover the money granted?

Could a private individual sue to recover under like circumstances? Suppose some philanthropist had proposed to the city of California that, if it would vote bonds in the amount of $100,000 for the construction of a municipal auditorium, he would give $50,000 to that project, provided none but residents of California were employed in the construction. Suppose those conditions were accepted and met and the auditorium constructed. Who would say that that philanthropist thereafter might sue and recover back?

■ But, it will be said, the supposed case is not parallel with this. It will be said that in this case the grant was made by agents for a principal, and that the agents had no authority from the principal to make the grant. The principal is the United States. The agents are the President and the Administrator. Very well. Was not the grant made by agents within the scope of their apparent authority, to wit, a statute regularly enacted by the Congress? The general rule is that a principal in such a case is bound by the acts of his agent. And, when the United States sues in court, it is subjected to the same law as determines the rights of others. United States v. O'Grady, 22 Wall. 641, 22 L. Ed. 772.

It is true that there are decisions of the Supreme Court, controlling if in point, and of other federal courts, which rule that money paid out without authority of law by an official of the United States may be recovered from the recipient in an action for money had and received. These cases have been cited by learned counsel. Wisconsin Central R. Co. v. United States, 164 U. S. 190, 17 S. Ct. 45, 41 L. Ed. 399; Bayne v. United States, 93 U. S. 642, 23 L. Ed. 997; United States v. Burchard, 125 U. S. 176, 8 S. Ct. 832, 31 L. Ed. 662; Sutton v. United States, 256 U. S. 575, 41 S. Ct. 563, 65 L. Ed. 1099, 19 A. L. R. 403; Bank of United States v. Bank of Washington, 6 Pet. 8, 8 L. Ed. 299; Butte A. & P. Ry. Co. v. United States (C. C. A.) 61 F.(2d) 587; Talcott v. United States (C. C. A.) 23 F.(2d) 897; United States v. Kerr (C. C.) 196 F. 503; United States v. Gillmore (C. C.) 189 F. 761. Not one of these cases involved a grant of money upon conditions complied with by the recipient nor a grant made pursuant to an act of Congress thereafter held invalid. They involved payments made without any statutory authority or under some misconstruction of a statute.

■ While it has been most authoritatively said that a legislative act held unconstitutional is as if it never had been enacted (see Norton v. Shelby County, 118 U. S. 442, 6 S. Ct. 1121, 30 L. Ed. 178), and while, generally speaking, that is true, still it is not always absolutely true. If there

468

is no statute authorizing a grant of money from the Treasury to a citizen, the citizen, because he is presumed to know the law, is presumed to know that fact. But, although the citizen is presumed to know the law, he is not presumed to know that a statute, which even the Supreme Court will presume is constitutional, is unconstitutional. So said the Supreme Court in United States v. Realty Company, 163 U. S. 427, 438, 16 S. Ct. 1120, 1125, 41 L. Ed. 215, to which, in another connection, I have hereinbefore referred. The language of the court was:

"There are occasions when the presumption that every man knows the law must be enforced for the safety of society itself. An individual on trial for a violation of the criminal law will not be heard to allege, as a defense, that he did not know the act of which he was guilty was criminal. But in such a case as this, knowledge of the invalidity of the law in advance of any authoritative declaration to that effect will not be imputed to those who are acting under its provisions, and receiving the benefits provided by its terms. These parties cannot be held bound, upon the question of equitable or moral consideration, to know what no one else actually knew, and what no one could know prior to the determination by some judicial tribunal that the law was unconstitutional. Although it should finally turn out that the law is invalid, and is so pronounced, yet, during all the time of its operation, as has been stated, all the officers of the government united in treating it as a valid act. No court had determined to the contrary. It was a question at least admitting of argument. Under such circumstances, can it be said that the plaintiffs in these suits, and persons situated like them, were bound to know this law was, and would be pronounced, unconstitutional, and that no rights could be acquired under it, and that they would not be justified in proceeding to manufacture sugar according to its provisions?"

That the citizen is not presumed to know that a duly enacted statute is unconstitutional is significant in this connection.

A suit by the United States to recover money illegally paid by some government official is an action upon the implied contract of the recipient to pay it back, because the recipient, being presumed to know the law, knew the official had no right to pay the money to him. Wisconsin Cent. R. Co. v. United States, 164 U. S. 190, 212, 17 S. Ct. 45, 41 L. Ed. 399. The whole basis of this obligation to repay disappears in a case in which the recipient is not presumed to know the law, as when he is not presumed to know that a statute is unconstitutional.

Again, an action for money had and received, although a law action, is governed by equitable principles (41 Corpus Juris, 28) and is subject to either legal or equitable defenses. 41 Corpus Juris, 59. In a court enforcing and obedient to the principles of equity, what standing would the United States have to recover from the city of California a grant of money, even illegally made, but relying on which the city had been led to vote bonds and to comply with various burdensome requirements, unless it first restored the city to the situation in which it was before.

If the United States can recover in an action for money had and received because of money paid under authority of a statute later held unconstitutional, any of the states has the same right in a like situation. The state of Missouri has that right.

Scores of Missouri statutes have been held unconstitutional because of defects in their titles, as that the subject-matter was not clearly stated in the title. Suppose a statute providing for a public building at the state capital, providing for the letting of a contract for its erection, and appropriating money. The contract is let. The building is constructed. The contractor is paid. Then it is asserted that the title of the act is defective and the act is held invalid. Can the state of Missouri recover from the contractor in an action for money had and received and at the same time keep the building constructed for it? Certainly not. Nothing could be more inequitable. He who seeks equity must do equity. And the action for money had and received is governed by equitable principles. Neither then could the United States recover from the city of California in an action for money had and received, not in the form of a mere gratuity, but upon conditions met and performed.

I think there may be yet another reason for the conclusion that the United States cannot recover back from the city of California the money granted that city. If the money was illegally granted by officials of the government, and if its acceptance resulted in an implied promise to repay, and hence, as is contended, an indebtedness to the United States, whose indebtedness is it? Can it be the indebtedness of the city?

Section 12 of article 10 of the Constitution of Missouri provides that: "No * * * city * * * shall be allowed to become indebted in any manner or for any purpose to

an amount exceeding in any year the income and revenue provided for such year, without the consent of two-thirds of the voters thereof. * * * "

Now, if officials of a city, without the consent of two-thirds of the voters in the city, deliberately and intentionally undertake to issue the city's bonds and so to create a city indebtedness, they cannot create such indebtedness. The bonds so issued would be worthless scraps of paper. No suit could be maintained against the city upon such bonds.

If the city officials cannot intentionally subject the city to indebtedness within the meaning of section 12 of article 10 of the Constitution of Missouri, certainly they cannot do it unintentionally as by an implied promise to repay money granted by government officials in the name of the United States. If they impliedly promised to repay money received from the United States, it was their promise as individuals, not that of the city, for they could not promise for the city.

### Final Summary.

5. Recapitulating the several rulings in this opinion, they are: (1) Title 2 of the National Industrial Recovery Act (40 USCA § 401 et seq.) was a valid exercise of power by Congress under the general welfare provision of the Constitution. (2) The loan and grant to the city of California were within the scope of title 2. (3) The plaintiff cannot question the validity of title 2. (4) The plaintiff's property has not been taken, and is not threatened with being taken, in violation either of the Fifth or Fourteenth Amendments. (5) No facts are alleged in plaintiff's bill entitling it to equitable relief.

It follows that the motions to dismiss should be sustained.